1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9

10    CHAMBER OF COMMERCE OF THE
      UNITED STATES OF AMERICA,
11                        *Plaintiff*,

              v.

12    CITY OF SEATTLE,

13    SEATTLE DEPARTMENT OF FINANCE
      AND ADMINISTRATIVE SERVICES,
14

15    and

16    FRED PODESTA, in his official capacity as
      Director, Finance and Administrative
17    Services, City of Seattle,
                          *Defendants*.

      Case No.

      COMPLAINT

18

19                        **INTRODUCTION**

20        1.    The City of Seattle has enacted an Ordinance Relating to Taxicab, Transportation

21    Network Company, and For-Hire Vehicle Drivers, which applies only to individuals working as

22    independent contractors, and which purports to enable those distinct economic actors to form a

23    union in order to collude on the prices and terms for their services.   This Ordinance is

24    unprecedented, and there are good reasons that none of the other approximately 40,000

25    municipal entities in this Nation has previously tried to authorize collective bargaining by

26    independent contractors: such an action is barred by well-established law under the Sherman Act

COMPLAINT - 1

1    and the National Labor Relations Act, among other laws.  The Chamber of Commerce of the

2    United States of America files this civil action seeking (1) a declaration that the City's Ordinance

3    is unlawful and (2) an injunction against its enforcement.  Absent judicial intervention, the City

4    of Seattle and thousands of other municipalities would be free to adopt their own disparate

5    regulatory regimes, which would balkanize the market for independent-contractor services and

6    inhibit the free flow of commerce among private service providers around the Nation.

7          2.      The unfettered ability of individuals to go into business for themselves has long

8    been an important engine of American economic growth.  This entrepreneurial tradition is an

9    exceptional feature that distinguishes our economy from much of the rest of the world.

10         3.      The power of America's entrepreneurial spirit has only grown as technology has

11   transformed the way Americans can do business.  One of the most recent manifestations of that

12   trend is the so-called "on demand" economy, which harnesses several technological

13   revolutions—such as the Internet, GPS, and smartphones and tablet computers—to connect

14   individual service providers with customers.  This innovation has dramatically increased the

15   flexibility of independent contractors to conduct business where, when, and as much or as little

16   as they choose in a variety of business enterprises—transporting passengers, performing delivery

17   services, providing lodging, or other work—for as many (or as few) different entities or

18   customers as they wish.  As a result, the stay-at-home parent may work during school hours; the

19   student may do so between classes; and others may work only as long as it takes to achieve a

20   particular financial goal, such as remodeling a home or paying off credit card debt.

21         4.      Federal law has traditionally allowed the competitive market to regulate these

22   private agreements between independent economic actors free from governmental interference.

23   This allows individuals the freedom to negotiate the arrangement that best suits his or her

24   individual circumstances.  Thus, Congress expressly determined that independent contractors

25   should not be subject to collective bargaining obligations under the National Labor Relations Act

26   ("NLRA"), amending the NLRA to make this exclusion explicit after the National Labor

COMPLAINT - 2

1    Relations Board ("NLRB" or "Board") and the courts held otherwise.  And the Federal Trade

2    Commission has likewise repeatedly made clear that collective bargaining amongst these

3    independent service providers would constitute an illegal restraint on trade.

4         5.    It is against this backdrop of market freedom that the "on demand" economy has

5    flourished in recent years.  Nowhere are these changes more apparent than in the for-hire

6    transportation sector.  Many companies now offer riders the ability to contact for-hire drivers

7    through smartphone applications ("apps") that can immediately connect a rider with the driver

8    nearest to her location, providing quick access to transportation.  These arrangements, in turn,

9    have increased flexibility and efficiency on the part of for-hire drivers.

10        6.    These developments are not limited to technology companies.  Many traditional

11   taxicab and limousine companies have long used flexible independent-contractor arrangements

12   to provide services to customers.  And some traditional taxicab and limousine companies have

13   likewise deployed their own apps for use by independent-contractor drivers and riders.  As a

14   result of these diverse approaches, for-hire transportation is more widely available, more

15   convenient, and offers better service to the public than in years past.  And just as importantly, it

16   provides business opportunities for a broad and diverse group of individuals who value the

17   flexibility that it provides and the entrepreneurial spirit that it rewards.

18        7.    The City of Seattle's Ordinance would restrict the market freedom relied upon by

19   all for-hire drivers who are part of independent-contractor arrangements, whether with a

20   transportation-app company, a traditional taxicab company, or a limousine service.  Under the

21   guise of regulating public safety, the Ordinance at issue would, for the first time anywhere in the

22   United States, insert a third-party labor union into the relationship between independent

23   contractors and companies and require agreements that would fix wages and prices in violation

24   of the nation's antitrust and labor laws.  Indeed, the Ordinance explicitly requires for-hire drivers

25   and their partners to reach anticompetitive agreements by engaging in collective bargaining that

26

COMPLAINT - 3

1    federal law does not permit.  Nothing in the Washington State law upon which the City relies

2    authorizes the City's actions, and federal antitrust and labor laws explicitly prohibit them.

3    8.    If allowed to stand, Seattle's Ordinance would threaten one of the most vibrant,

4    cutting edge sectors of the economy.  The most recent available data demonstrates that there are

5    nearly 40,000 general purpose local governments in the United States.  *See* U.S. Census Bureau,

6    Census of Governments (2012).  If Seattle is permitted to adopt and implement its Ordinance

7    here, then approximately 40,000 other municipalities may attempt to do so as well.   But

8    permitting thousands of separate and independent collective bargaining regimes for independent

9    contractors would inflict significant costs upon the for-hire transportation sector and, more

10   broadly, undermine the flexibility, efficiency, and choice that accompany independent contractor

11   arrangements.   In short, Seattle's Ordinance reflects a broadside attack on the fundamental

12   premises of independent contractor arrangements, as well as the nascent on-demand economy

13   that relies on it.  Federal labor and antitrust laws were designed precisely to avoid this result, and

14   to encourage innovation and the free flow of commerce among private service providers across

15   the Nation.

16   9.    Accordingly, Plaintiff, the Chamber of Commerce of the United States of

17   America ("Chamber"), seeks a declaration, pursuant to 28 U.S.C. §§ 2201 and 2202, that the

18   City of Seattle's Ordinance Relating to Taxicab, Transportation Network Company, and For-

19   Hire Vehicle Drivers, adding Section 6.310.735 to the Municipal Code, (1) violates and is

20   preempted by federal antitrust law; (2) is preempted, in whole or in part, by the National Labor

21   Relations Act, 29 U.S.C. § 151 et seq.; (3) violates the federal rights of its members; (4) is not

22   authorized by Washington Revised Code §§ 46.72.001 and 81.72.200; (5) violates the

23   Washington Consumer Protection Act, Washington Revised Code Chapter 19.86; and (6)

24   violates the Washington Public Records Act, Washington Revised Code Chapter 42.56.  Plaintiff

25   also seeks injunctive relief prohibiting Defendants from enforcing the Ordinance.

26

COMPLAINT - 4

1

## JURISDICTION AND VENUE

2      10.     This Court has jurisdiction over the subject matter of this civil action under

3  28 U.S.C. § 1331 because it arises under the Constitution and laws of the United States, and

4  under 28 U.S.C. § 1337 because it arises under an Act of Congress regulating commerce.  This

5  Court has jurisdiction to review the state law claims under 28 U.S.C. § 1367, because they form

6  part of the same case or controversy as the claims arising under the Constitution and laws of the

7  United States.

8      11.     This Court also has jurisdiction under 28 U.S.C. § 1332 because the amount in

9  controversy satisfies the statutory requirements, and the suit is between citizens of different

10  States.  Plaintiff is incorporated in the District of Columbia, and its principal place of business is

11  in the District of Columbia.  Defendants are citizens of Washington.

12      12.     Venue is proper in this judicial district under 28 U.S.C. § 1391(b) because a

13  substantial portion of the events giving rise to this action occurred in this judicial district and

14  because the Defendants reside or are found in this judicial district.

15

## PARTIES

16      13.     Plaintiff is a non-profit organization created and existing under the laws of the

17  District of Columbia, headquartered at 1615 H Street, N.W., Washington, D.C.  The Chamber is

18  the world's largest federation of businesses and associations, directly representing 300,000

19  members and indirectly representing the interests of more than three million U.S. businesses and

20  professional organizations of every size, in every industry sector, and from every geographic

21  region of the country.  Of particular relevance here, the Chamber routinely advocates on matters

22  of federal antitrust and labor relations policy and represents the interests of its members in

23  antitrust and labor relations matters before the courts.

24      14.     Some of the Chamber's members operate taxicab, transportation network, and for-

25  hire vehicle businesses within the jurisdictional limits of the City of Seattle, and thus are subject

26  to the Ordinance.  Some of these members contract with fifty (50) or more for-hire drivers, and

COMPLAINT - 5

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
Telephone (206) 624-0900

1    thus are subject to the Ordinance's driver-reporting requirements, whereas others are subject to

2    other portions of the Ordinance, including (but not limited to) its collective-bargaining and anti-

3    retaliation provisions.  In bringing this lawsuit, the Chamber seeks to vindicate the interests of

4    these members and, more broadly, the interests of many more members and non-member

5    businesses that would be harmed if thousands of municipalities were permitted to establish a

6    balkanized system of labor law for independent contractors.  The individual members themselves

7    are not indispensable to the proper resolution of the case.

8        15.     Defendant City of Seattle (the "City") is a municipality of the State of

9    Washington.

10       16.     Defendant Seattle Department of Finance and Administrative Services

11    ("SDFAS") is a municipal agency of the City and is the agency charged in the Ordinance with

12    responsibility for administering and enforcing the portions of the Ordinance at issue in this

13    action.

14       17.     Defendant Fred Podesta is the Director of SDFAS and the officer of SDFAS

15    charged in the Ordinance with responsibility for administering and enforcing the portions of the

16    Ordinance at issue in this action.  Mr. Podesta is sued in his official capacity.

17                              **FACTUAL ALLEGATIONS**

18               **I. THE FOR-HIRE TRANSPORTATION BUSINESS**

19       18.     Individuals use for-hire transportation services to meet many of their

20    transportation needs, particularly in urban areas where owning and operating a vehicle may be

21    impractical or expensive.

22       19.     Many drivers working in the for-hire transportation industry have traditionally

23    operated as independent contractors, and this tradition continues today.  These drivers accept

24    street hails or rely on taxicab companies or black-car or limousine services to connect them to

25    customers.  Taxi and limousine companies typically maintain an office or dispatch center where

26

COMPLAINT - 6

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
Telephone (206) 624-0900

1    consumers needing service could call and request it, and the dispatch center then communicates

2    with its drivers to fulfill rider requests.

3          20.    In addition to traditional taxicab and limousine services, advancing technology

4    over the last several years, and in particular the advent of smartphones, tablets, and their

5    applications, has further expanded the flexibility that comes from working as an independent

6    contractor, including in the for-hire transportation industry.  Companies such as Uber and Lyft

7    have developed ride-referral applications that allow a rider requesting service to automatically

8    communicate his or her location, and for computer systems to match that potential rider with the

9    available driver who is physically closest to the customer.  The applications permit a rider to link

10    a credit or debit card to his or her account, which automatically deducts the correct fare for the

11    ride taken.  Finally, the applications also permit riders to provide real-time feedback regarding

12    their experience with the driver, allowing almost immediate operational changes that better serve

13    both riders and drivers.  Drivers are also able to provide feedback regarding particularly positive

14    or negative experiences with their riders.

15          21.    These new ride-referral applications provide a number of benefits to the cities in

16    which they operate and, particularly, to consumers.  The Federal Trade Commission has

17    acknowledged that these benefits include "providing customers with new ways to more easily

18    locate, arrange, and pay for passenger motor vehicle transportation services," more efficiently

19    allocating resources, helping to "meet unmet demand for passenger motor vehicle transportation

20    services," and "improv[ing] service in traditionally underserved areas."   Federal Trade

21    Commission Comments on Chicago Proposed Ordinance O2014-1367, at 3 (Apr. 15, 2014),

22    https://www.ftc.gov/system/

23    files/documents/advocacy_documents/ftc-staff-comment-honorable-brendan-reilly-concerning-

24    chicago-proposed-ordinance-o2014-1367/140421chicagoridesharing.pdf.  Seattle's Mayor, in a

25    statement refusing to sign the Ordinance, likewise noted the "valuable new tools" that these

26

COMPLAINT - 7

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
Telephone (206) 624-0900

1    arrangements provide to City residents.  Mayor Comments on TNC Ordinance (Dec. 14, 2015),

2    murray.seattle.gov/mayor-comments-on-tnc-ordinance.

3         22.    To receive transportation requests via the new app-based platforms, drivers pay a

4    technology licensing fee to the company that owns the application, which is a percentage of the

5    fare that the rider pays.  The companies that own the applications collect the fee and any other

6    related fees from the riders on behalf of drivers, subtract their technology licensing fee, and remit

7    the remainder to the drivers.  Fares vary based on the length of the ride, quality of vehicle

8    requested, and the time of day and the day of the week.  These latter variations are based on

9    supply and demand; weekend evenings are more popular times than mid-morning weekdays, for

10   example, and thus the same ride may cost more if taken during the former than the latter.  This

11   dynamic pricing ensures service reliability by correcting supply/demand imbalances—it

12   guarantees that people who request a ride during a time of high demand will get one, and that

13   more drivers simultaneously will hit the road to increase supply and lower prices once again.

14        23.    Drivers who receive ride requests from these software apps choose when they

15   work, choose where they work, and operate in their own vehicle.  These flexible, driver-selected

16   schedules permit a stay-at-home dad to work only while his children are at school, or a student to

17   work between her classes or on weekends.  They also permit an individual to choose full-time

18   work.  Drivers are not required to work any particular amount of time each week, allowing a

19   parent to attend school functions, a student to decide not to work during finals, or an employee of

20   another business to supplement his or her income temporarily.  The benefits to drivers from these

21   flexible arrangements are significant and well-documented.  *See* Hall & Krueger, *An Analysis of*

22   *the Labor Market for Uber's Driver-Partners in the United States* (Jan. 22, 2015),

23   https://irs.princeton.edu/sites/irs/files/An%20Analysis%20of%20the%20Labor%20Market%20for%20Ub

24   er%E2%80%99s%20Driver-Partners%20in%20the%20United%20States%20587.pdf.

25        24.    Drivers may, if they choose to, contract with more than one service, driving with

26   a black-car company or a limousine service one day, Uber for one day (or one trip), Lyft the next

COMPLAINT - 8

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
*Telephone (206) 624-0900*

1   day (or trip), and another comparable service for transporting either people or goods the next.

2   Indeed, many drivers simultaneously accept ride requests from more than one company,

3   operating multiple software applications at the same time to ensure the greatest volume of trip

4   requests.  Drivers are free to receive ride requests from any service they choose on a ride-by-ride

5   basis, and turnover is significant; the population of drivers working with a particular service

6   changes from week to week as new drivers sign up, and others decide to stop using the service,

7   either temporarily or permanently.  In short, despite the Ordinance's one-size-fits-all approach,

8   there is no "typical" driver.

9        25.    Thanks to the innovations pioneered by these software companies, barriers to

10  entry for this work are low.  They generally require the individual to have attained a certain age

11  (usually 18 or 21), have a valid drivers' license, pass a background check, and have a vehicle

12  suitable for transporting passengers.  An individual may use his own smartphone to communicate

13  with the company, or may lease one; in either case, communications occur through a smartphone

14  application designed, operated, maintained, and updated by the transportation network company.

15       26.    Since these technological changes revolutionized the for-hire transportation

16  industry, millions of people worldwide have signed up with these platforms as drivers and

17  potential riders.  Many consumers, particularly in urban areas, now use these services as their

18  principal form of transportation.  And many workers who require a flexible work schedule and

19  might otherwise be unable to find work or supplement their income now earn money working as

20  for-hire drivers.

21       27.    Some drivers have challenged their status as independent contractors in various

22  jurisdictions.  For example, a group of drivers in California have alleged that they are employees,

23  rather than independent contractors, and thus are subject to various state and federal employment

24  laws.  *E.g.*, Complaint, *O'Connor v. Uber Techs., Inc.*, No. 3:13-cv-03826 (N.D. Cal.); *see also*

25  *Berwick v. Uber Techs., Inc.*, 2015 WL 4153765 (Cal. Labor Comm., June 3, 2015).

26

COMPLAINT - 9

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
Telephone (206) 624-0900

28.     Similarly, the International Brotherhood of Electrical Workers recently filed a petition with the National Labor Relations Board ("NLRB" or "Board") claiming that Uber drivers are "employees" within the NLRA, and seeking to represent them. *Uber USA, LLC*, NLRB Case No. 29-RC-168855 (Pet. filed Feb. 2, 2016). And a few drivers have argued before the Board that they should be considered "employees" under the NLRA, rather than independent contractors. *See Mamdooh "Abe" Ramzi Husein*, NLRB Case No. 14-CA-158833 (Pet. filed Aug. 27, 2015); *Catherine London & John Billington*, NLRB Case Nos. 20-CA-160720, 20-CA-160717 (Pets. filed Sept. 24, 2015); *Brittany Nicol*, NLRB Case No. 28-CA-160791 (Pet. filed Sept. 25, 2015). The NLRB has recently petitioned for enforcement of administrative subpoenas against Uber, noting that a threshold issue in the cases pending before it is whether the drivers are employees or independent contractors, and that the Board has broadened the scope of its investigation to determine "whether *all* drivers subject to" Uber's licensing agreement are employees. Memorandum in Support of Application at 3, *NLRB v. Uber Techs., Inc.*, No. 3:16-cv-987 (N.D. Cal. Feb. 29, 2016). These matters are still pending, and the NLRB has not yet definitively resolved whether or not these individuals are "employees" under the NLRA.

## II. THE ORDINANCE

29.     The Seattle City Council unanimously (8-0) passed the Ordinance Relating to Taxicab, Transportation Network Company, and For-Hire Vehicle Drivers on December 14, 2015. Having previously expressed concerns about the Ordinance's "several flaws," Mayor Murray refused to sign it, returning it to the Council unsigned on December 23, 2015. *See* Mayor Comments on TNC Ordinance (Dec. 14, 2015). The Ordinance became law pursuant to section 1.04.020 of the Seattle Municipal Code without the Mayor's approval on January 22, 2016.

30.     The Ordinance establishes a collective-bargaining scheme unique to the City of Seattle through which "for-hire drivers" collectively negotiate the terms of their contractual relationships with "driver coordinators." Ordinance § 1(I).

COMPLAINT - 10

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA 98101
Telephone (206) 624-0900

1      31.    A "driver coordinator" includes any entity that "contracts with" for-hire drivers

2    "for the purpose of assisting them with, or facilitating them in, providing for-hire services to the

3    public." *Id.* § 2.  Driver coordinators include, but are not limited to, "taxicab associations, for-

4    hire vehicle companies, and transportation network companies," (*id.*), including companies like

5    Uber and Lyft.

6      32.    The Ordinance applies only to for-hire drivers who are independent contractors,

7    not employees.  Ordinance § 6 ("The provisions of this ordinance do not apply to drivers who are

8    employees under 29 U.S.C. § 152(3)).

9      33.    The City's Director of Finance and Administrative Services ("Director"),

10    currently Defendant Podesta, is authorized to administer and enforce the collective-bargaining

11    regime, which proceeds in several steps.  *Id.*  First, an entity seeking to be designated as a

12    drivers' union—or "qualified driver representative" ("QDR")—must submit a request to the

13    Director pursuant to regulations to be issued by the Director.  *Id.* § 3(C).  Once the Director

14    approves one or more QDRs, those QDRs can notify driver coordinators who contract with more

15    than fifty drivers of their intent to seek to represent their drivers.  *Id.* § 3(C)(2).  Driver

16    coordinators must then provide all QDRs that have given notice with the names, addresses, email

17    addresses, and phone numbers of "all qualifying drivers they hire, contract with, or partner with"

18    as of that particular date, other than those with whom the driver coordinator has an

19    employer/employee relationship.  *Id.* § 3(D).  The QDRs then have four months to obtain consent

20    from a majority of listed drivers to represent them in dealings with the driver coordinator,

21    including collective bargaining.  If a majority of a driver coordinator's drivers consent to the

22    representation, the Director must certify the QDR as the "exclusive driver representative"

23    ("EDR") "for all drivers for that particular driver coordinator," representing all drivers who do

24    business with that driver coordinator and, correspondingly, preventing the driver coordinator

25    from doing business with any drivers who do not wish to be represented by, or to work under the

26    terms negotiated by, the EDR.  *Id.* § 3(F)(2).

COMPLAINT - 11

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
*Telephone (206) 624-0900*

1         34.     The Ordinance permits drivers to authorize more than one QDR to represent them

2 in dealings with the driver coordinator. Accordingly, if more than one QDR obtains signatures

3 from a majority of a particular coordinator's drivers, the Director is required to certify the QDR

4 who received the most signatures as the EDR. *Id.*

5         35.     The Ordinance permits a QDR to be certified as an EDR based on its having

6 obtained authorization from a majority of the drivers contained on the list that the driver

7 coordinator provides, regardless of whether those individuals still constitute a majority of the

8 drivers of a particular driver coordinator as of the date of the certification months later. The

9 Ordinance permits a "majority" to be determined using "statistical methods" required by the

10 Director; depending on how this provision is implemented, such methods may or may not

11 produce selection of an EDR by an actual majority of drivers who contract with a particular

12 driver coordinator. *Id.* § 3(F)(1).

13         36.     Once an EDR is certified, the driver coordinator is obligated to meet with the

14 EDR "and negotiate in good faith certain subjects to be specified in rules or regulations

15 promulgated by the Director, including, but not limited to, best practices regarding vehicle

16 equipment standards; safe driving practices; the manner in which the driver coordinator will

17 conduct criminal background checks of all prospective drivers; the nature and amount of

18 payments to be made by, or withheld from, the driver coordinator to or by the drivers; minimum

19 hours of work, conditions of work, and applicable rules." *Id.* § 3(H)(1). The Director does not

20 participate in the negotiation.

21         37.     After the EDR and the driver coordinator reach an agreement, they are required to

22 submit it to the Director, who is charged with determining whether the agreement effectuates the

23 Ordinance's policies. If the Director determines that it does, then the agreement is binding on

24 the parties. If not, the Director sends it back to the parties with "a written explanation of the

25 failure(s) and, at the Director's discretion, recommendations to remedy the failure(s)." *Id.*

26 § 3(H)(2)(b). No agreement between a driver coordinator and an EDR becomes effective until

COMPLAINT - 12

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA 98101
Telephone (206) 624-0900

the Director "determines its adherence" to city law and policy. *Id.* § 3(H)(2)(c). However, the Ordinance does not give the Director authority to dictate an agreement's terms or otherwise supervise the EDR.

38.   When a collective-bargaining agreement becomes effective, a driver coordinator is not only bound by the terms of the agreement, but is also forbidden from making changes "to subjects" covered by the Ordinance without first "meeting and discussing those changes in good faith with the EDR, even if the driver coordinator and EDR have not included terms concerning such subjects in their agreement." *Id.* § 3(J)(3).

39.   If the driver coordinator and EDR do not reach an agreement, both entities are obligated to submit to "interest arbitration upon the request of the other," and the arbitrator then submits what he or she believes is "the most fair and reasonable agreement" to the Director for approval. *Id.* § 3(I)(1)–(3). Again, if the Director finds that the agreement "fails to fulfill" the Ordinance's requirements, he "shall remand the agreement to the interest arbitrator with a written explanation of the failure(s) and, at the Director's discretion, recommendations to remedy the failure(s)." *Id.* § 3(I)(4)(b). Still, the Ordinance likewise does not give the Director authority to directly negotiate or dictate the terms of an agreement, or otherwise supervise the EDR.

40.   The Ordinance expressly allows an EDR to demand that the agreement—later approved by the Director—"require membership of for-hire drivers in the EDRs entity/organization within 14 days of being hired, contracted with, or partnered with by the driver coordinator to provide for-hire transportation services to the public." *Id.* § 3(H)(4). Given the great diversity among the work schedules and preferences of for-hire drivers, this arrangement will allow a subset of drivers at a particular point in time to set terms for other drivers who do not wish to join a union and may be disadvantaged by the bargain struck.

41.   The Ordinance also contains a provision prohibiting any driver coordinator from engaging in any act of "retaliate[ion] against any for-hire driver for exercising the right to participate in the representative process," and from making any "offer to provide money or

COMPLAINT - 13

1    anything of value to any for-hire driver with the intent of encouraging the for-hire driver to

2    exercise, or to refrain from exercising, that right." *Id.* § 3(K). It is also unlawful for a driver

3    coordinator to "[i]nterfere with, restrain, or deny the exercise of, or the attempt to exercise," any

4    right the Ordinance protects. *Id.* The Director has authority to enforce this provision, after

5    investigation and a hearing, and to assess a penalty of up to $10,000 per day for non-compliance.

6    *Id.,* § 3(M). The anti-retaliation provision may also be enforced through a private right of action

7    brought in Washington State court. *Id.,* § 3(M)(3).

8          42.    The Director is authorized to investigate alleged violations of the Ordinance, and

9    to enforce it through, among other things, imposition of a "daily penalty of up to $10,000 for

10   every day the violator fails to cure the violation." *Id.* § 3(M)(1). The Ordinance's provisions

11   governing provision and use of driver lists, good faith bargaining and interest arbitration

12   obligations, and anti-retaliation are also enforceable through a private right of action in

13   Washington State court. *Id.* § (3)(M)(3). Courts enforcing these provisions are permitted to

14   award "all remedies available at law or in equity appropriate to remedy any violation," including

15   reasonable attorneys' fees and costs. *Id.*

16         43.    The Chamber has asked Defendants to state that they will not enforce the

17   Ordinance, and they have declined to make such a commitment.

18               **III. EFFECTS OF THE ORDINANCE**

19         44.    The Chamber's members have incurred, and will continue to incur, substantial

20   costs as a direct result of the Ordinance. Because they work principally with independent

21   contractors, these members have little to no experience with labor relations matters, including

22   union organizing, negotiating contracts with unions, and other related matters. In order to

23   prepare for the potential organizing and bargaining activity that the Ordinance contemplates,

24   these companies are beginning to engage labor relations experts, and may be required to recruit

25   and hire labor relations personnel for their own staff. To ensure that these member companies

26

COMPLAINT - 14

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA 98101
Telephone (206) 624-0900

1   are prepared for the Ordinance's full implementation in a matter of months, these efforts have

2   already begun.

3        45.    In addition, the Chamber's members have started and will continue to expend

4   both time and money to educate their drivers about the disadvantages of choosing to be

5   represented by an EDR.

6        46.    Some of the Chamber's members also wish to amend their agreements or

7   contracts with their independent contractors to require drivers not to provide statements of

8   interest to any QDR that would seek to represent the drivers of those companies.  On information

9   and belief, Defendants construe section 3(K) of the Ordinance as prohibiting the Chamber's

10  members from seeking and enforcing a promise not to provide a statement of interest to a QDR

11  as a condition of their agreements or contracts with drivers.   Accordingly, these companies

12  would risk private lawsuits from drivers, as well as substantial fines of up to $10,000 per day

13  from the City, were they to engage in this otherwise lawful conduct.

14       47.    The International Brotherhood of Teamsters Local 117, by and through its public

15  statements and involvement in drafting the Ordinance, has indicated that it or its affiliated

16  entities the App-Based Drivers Association and the Western Washington Taxicab Operators

17  Association will promptly seek to be designated as QDRs under the statute and, once so

18  designated, will seek to represent the drivers of one or more of the Chamber's members, thereby

19  imposing on those members affirmative duties under the Ordinance, including the duty to turn

20  over confidential personal and commercial information about their drivers.  On information and

21  belief, these entities satisfy the Ordinance's criteria for designation as QDRs, which include (a)

22  registration with the Washington Secretary of State as a not-for-profit entity; (b) organizational

23  by-laws that give drivers the right to participate as members of the organization and participate

24  in the democratic control of the organization; and (c) experience in or a demonstrated

25  commitment to assisting stakeholders in reaching consensus agreements with, or related to,

26  employers and contractors.  Ordinance § 3(B).  Given these requirements, and on information

COMPLAINT - 15

1    and belief, entities eligible to become QDRs under the Ordinance will also satisfy the statutory

2    definition of "labor organization" under the National Labor Relations Act, 29 U.S.C. § 152(5).

3         48.    Pursuant to the Ordinance, the Chamber's members will be required to disclose

4    proprietary information, in the form of lists of current driver names and contact information,

5    once the Ordinance takes effect and QDRs seek to represent drivers with whom they contract.

6    Disclosure of these materials will create immediate harm to both the Chamber's members, who

7    treat this information as confidential, proprietary, trade secret information; and to the drivers

8    themselves, many of whom consider their personally identifiable information, and their work

9    with these driver coordinators, to be confidential.

10        **COUNT ONE:  VIOLATION OF THE SHERMAN ANTITRUST ACT**

11        49.    Plaintiff incorporates by reference the allegations contained in all the preceding

12   paragraphs.

13        50.    Under § 1 of the Sherman Antitrust Act, a "contract, combination in the form of

14   trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States" is

15   illegal.   15 U.S.C. § 1.   As the Supreme Court has repeatedly held, this provision forbids

16   independent economic actors—such as independent contractors—from colluding on the prices

17   they would accept for their services or otherwise engaging in concerted anticompetitive action in

18   the marketplace.  *See, e.g.*, *FTC v. Sup. Ct. Trial Lawyers Ass'n*, 493 U.S. 411, 422 (1990); *FTC*

19   *v. Ind. Fed'n of Dentists*, 476 U.S. 447, 457–58 (1986); *Nat'l Soc. of Prof. Eng'rs v. United*

20   *States*, 435 U.S. 679, 693–95 (1978).   Specifically, collective bargaining by independent

21   contractors over the price and terms of a service is per se illegal under § 1 of the Sherman Act.

22   *Nat'l Soc. of Prof. Eng'rs*, 435 U.S. at 692–93.

23        51.    The Ordinance unlawfully authorizes for-hire drivers to engage in this per se

24   illegal concerted action by forming a cartel (under the aegis of a QDR), speaking as a single unit

25   through an exclusive representative (an EDR), and engaging in horizontal fixing of prices and

26   contractual terms.

COMPLAINT - 16

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
Telephone (206) 624-0900

1     52.    The anticompetitive behavior contemplated by the Ordinance restrains or

2    substantially affects interstate commerce because, for example, for-hire drivers and driver

3    coordinators in Seattle serve out-of-state passengers, transport passengers across state lines,

4    generate revenues from out-of-state sources, and use interstate highways and interstate

5    telecommunications equipment.  Drivers frequently receive ride requests for rides that cross

6    county and state borders.

7     53.    Through their enactment and enforcement of the Ordinance, including their

8    approval and endorsement of concerted action by EDRs and of the terms of anticompetitive

9    agreements, Defendants have committed and conspired to commit violations of the Sherman Act.

10    54.    The collective-bargaining scheme created through the Ordinance will have the

11    anticompetitive effect of shielding drivers from competition.  To give just a few examples,

12    drivers could negotiate for a cap on the number of active drivers, limits on the types of vehicles

13    that can be used, or limits on the maximum or minimum number of hours that drivers must be

14    available.  Each of these terms would limit the entry of new drivers and reduce the availability of

15    transportation for riders.

16    55.    Plaintiff's members will suffer injury as a direct result of the Defendants' illegal

17    conspiracy and restraint of competition.  For example, unions such as the Teamsters will seek to

18    reduce the prices paid to app-based companies for the use of their ride referral applications.  As a

19    result of the collective-bargaining process, those companies also will incur additional costs of

20    doing business with the conspirators, such as reimbursement of driver's expenses or payment of

21    other benefits.  Traditional for-hire companies that provide dispatch services for independent-

22    contractor drivers will suffer similar injuries, as they will be forced to accept reduced prices and

23    incur additional costs for offering dispatch service to drivers.  All of these increased costs, which

24    are due to decreased competition among independent contractors, threaten the viability of

25    companies that provide ride referral services.  And ultimately, the decrease in competition will

26    harm consumers, who will pay more for personal transportation but receive poorer service.

COMPLAINT - 17

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
Telephone (206) 624-0900

56.     The state-action doctrine does not immunize Defendant's anticompetitive conduct.   That doctrine provides antitrust immunity only if "the actions in question are an exercise of the State's sovereign power." *N.C. State Bd. of Dental Exam'rs v. FTC*, 135 S. Ct. 1101, 1110 (2015).  For purposes of this exception, private conduct is an exercise of the State's sovereign power only if (1) the conduct is authorized by a "clearly articulated" and "affirmatively expressed" state policy, and (2) the conduct is "actively supervised" by the State. *Id.*

57.     Neither of those requirements is met here.  No provision of Washington law clearly articulates or affirmatively authorizes collective bargaining for independent contractors generally, or specifically authorizes for-hire drivers to collectively bargain with driver coordinators over the prices and terms for which drivers' services will be offered.  Furthermore, the Ordinance does not (and cannot) ensure that the State of Washington will actively supervise the collective bargaining process and results to the extent required.  *Id.* at 1116.

58.     The anticompetitive conduct the Ordinance requires is also not immunized from antitrust liability by either the statutory or non-statutory labor exemptions to the antitrust laws.  Among other things, these exemptions do not protect combinations of independent business people, as opposed to combinations of employees covered by federal labor law.  *Am. Medical Ass'n v. United States*, 317 U.S. 519, 536 (1943).  The Ordinance exempts from coverage anyone who is in an employer/employee relationship under federal labor law (see Ordinance § 6), and consequently does not encompass the relationships to which the federal antitrust labor exemptions apply.

59.     As a result of Defendants' violation of the Sherman Antitrust Act as alleged herein, Plaintiff is entitled to injunctive and declaratory relief and an award of its attorneys' fees pursuant to 15 U.S.C. § 26.

COMPLAINT - 18

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
Telephone (206) 624-0900

**COUNT TWO:  PREEMPTION UNDER THE SHERMAN ANTITRUST ACT**

60.     Plaintiff incorporates by reference the allegations contained in all the preceding paragraphs.

61.     The Supremacy Clause of the Constitution of the United States provides that federal law is the "supreme Law of the Land" and therefore it preempts state and local laws that interfere with or are contrary to federal law.  U.S. Const. art. VI, cl. 2.

62.     Under § 1 of the Sherman Antitrust Act, a "contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States" is illegal.  15 U.S.C. § 1.  As the Supreme Court has repeatedly held, this provision forbids independent economic actors—such as independent contractors—from colluding on the prices they would accept for their services or otherwise engaging in concerted anticompetitive action in the marketplace.  *See, e.g.*, *Sup. Ct. Trial Lawyers Ass'n*, 493 U.S. at 422; *Ind. Fed'n of Dentists*, 476 U.S. at 457–58; *Nat'l Soc. of Prof. Eng'rs*, 435 U.S. at 693–95.  Specifically, collective bargaining by independent contractors over the price and terms of a service is *per se* illegal under § 1 of the Sherman Act.  *Nat'l Soc. of Prof. Eng'rs*, 435 U.S. at 692–93.

63.     The Ordinance unlawfully authorizes for-hire drivers to engage in this *per se* illegal concerted action by forming a cartel (under the aegis of a QDR), speaking as a single unit through an exclusive representative (an EDR), and engaging in horizontal fixing of prices and contractual terms.  And it requires driver coordinators to participate in such activity by compelling them to bargain over the price and terms for which the independent contractors' services will be offered to the public and forbidding any driver from entering into a different arrangement with a driver coordinator with whom he contracts.

64.     The anticompetitive behavior contemplated by the Ordinance restrains or substantially affects interstate commerce because, for example, for-hire drivers and driver coordinators in Seattle serve out-of-state passengers, transport passengers across state lines, generate revenues from out-of-state sources, and use interstate highways and interstate

COMPLAINT - 19

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
Telephone (206) 624-0900

1   telecommunications equipment.   Drivers frequently receive ride requests for rides that cross

2   county and state borders.

3       65.     By purporting to authorize concerted anticompetitive conduct in violation of the

4   Sherman Act, and by placing pressure on private parties to violate the Sherman Act in order to

5   comply with the Ordinance, the Ordinance conflicts with and is preempted by the Sherman Act.

6       66.     The collective-bargaining scheme created through the Ordinance will have the

7   anticompetitive effect of shielding drivers from competition.   To give just a few examples,

8   drivers could negotiate for a cap on the number of active drivers, limits on the types of vehicles

9   that can be used, or limits on the maximum or minimum number of hours that drivers must be

10   available.  Each of these terms would limit the entry of new drivers and reduce the availability of

11   transportation for riders.

12      67.     Plaintiff's members will suffer injury as a direct result of the Ordinance's restraint

13   of competition.   For example, under the Ordinance, unions such as the Teamsters will seek to

14   reduce the prices paid to app-based companies for the use of their ride referral applications.  As a

15   result of the collective-bargaining process, those companies also will incur additional costs of

16   doing business with the conspirators, such as reimbursement of driver's expenses or payment of

17   other benefits.   Traditional for-hire companies that provide dispatch services for independent-

18   contractor drivers will suffer similar injuries, as they will be forced to accept reduced prices and

19   incur additional costs for offering dispatch service to drivers.  All of these increased costs, which

20   are due to decreased competition among independent contractors, threaten the viability of

21   companies that provide ride referral services.  And ultimately, the decrease in competition will

22   harm consumers, who will pay more for personal transportation.

23      68.     The state-action doctrine does not immunize Defendant's anticompetitive

24   conduct.   That doctrine provides antitrust immunity only if "the actions in question are an

25   exercise of the State's sovereign power." *N.C. State Bd. of Dental Exam'rs*, 135 S. Ct. at 1110.

26   For purposes of this exception, private conduct is an exercise of the State's sovereign power only

COMPLAINT - 20

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
Telephone (206) 624-0900

1    if (1) the conduct is authorized by a "clearly articulated" and "affirmatively expressed" state

2    policy, and (2) the conduct is "actively supervised" by the State.  *Id.*

3         69.    Neither of those requirements is met here.  No provision of Washington law

4    clearly articulates or affirmatively authorizes collective bargaining for independent contractors

5    generally, or specifically authorizes for-hire drivers to collectively bargain with driver

6    coordinators over the prices and terms for which drivers' services will be offered.  Furthermore,

7    the Ordinance does not (and cannot) ensure that the State of Washington will actively supervise

8    the collective bargaining process and results to the extent required.  *Id.* at 1116.

9         70.    The anticompetitive conduct the Ordinance requires is also not immunized from

10   antitrust liability by either the statutory or non-statutory labor exemptions to the antitrust laws.

11   Among other things, these exemptions do not protect combinations of independent business

12   people, as opposed to combinations of employees covered by federal labor law.  *Am. Medical*

13   *Ass'n*, 317 U.S. at 536.  The Ordinance exempts from coverage anyone in an employer/employee

14   relationship under federal labor law (*see* Ordinance § 6), and consequently does not encompass

15   the relationships to which the federal antitrust labor exemptions apply.

16             **COUNT THREE: *MACHINISTS* PREEMPTION UNDER THE**
                        **NATIONAL LABOR RELATIONS ACT**
17

18        71.    Plaintiff incorporates by reference the allegations contained in all the preceding

19   paragraphs.

20        72.    The Supremacy Clause of the United States Constitution provides that federal law

21   is the "supreme Law of the Land" and therefore it preempts state and local laws that interfere

22   with or are contrary to federal law.  U.S. Const. art. VI, cl. 2.

23        73.    The principal federal statute regulating labor relations is the National Labor

24   Relations Act, 29 U.S.C. § 151 *et seq.*  The NLRA sets forth the rules governing employees'

25   rights to bargain collectively with their employer regarding the terms and conditions of

26

COMPLAINT - 21

1     employment, and proscribes as unfair labor practices certain activities by both employers and

2     labor organizations. *See* 29 U.S.C. §§ 157, 158.

3         74.     The NLRA preempts any state regulation of broad swaths of labor-related

4     activity, such as collective bargaining. *See Chamber of Commerce v. Brown*, 554 U.S. 60

5     (2008); *Machinists v. Wisc. Emp't Relations Comm'n*, 427 U.S. 132, 140 (1976). In Machinists,

6     the Court recognized that Congress intended certain conduct to be unregulated by government

7     and left to "the free play of economic forces," and that "Congress struck a balance of protection,

8     prohibition, and laissez-faire in respect to union organization, collective bargaining, and labor

9     disputes." *Brown*, 554 U.S. at 65. Accordingly, States may not regulate "within a zone

10     protected and reserved for market freedom" by the NLRA. *Id.* at 66.

11         75.     In determining whether Congress meant to insulate a particular zone of activity

12     from state regulation, "[w]hat Congress left unregulated is as important as the regulations that it

13     imposed." *Golden State Transit Corp. v. Los Angeles*, 493 U.S. 103, 110 (1989).

14         76.     Here, Congress expressly left independent contractors unregulated and excluded

15     them from collective-bargaining requirements. 29 U.S.C. § 152(3) ("The term 'employee' . . .

16     shall not include any individual . . . having the status of an independent contractor."). This

17     provision reflects Congress's intent to ensure that independent contractors remain regulated by

18     "the free play of economic forces," or market forces, rather than by city ordinances imposing

19     collective-bargaining schemes.

20         77.     If Defendants are permitted to implement and enforce the Ordinance, other local

21     governments may also seek to regulate collective bargaining for independent contractors in a

22     manner different from the one chosen by the City of Seattle. Subjecting independent contractor

23     relationships to thousands of different bargaining schemes is contrary to Congressional intent in

24     enacting the NLRA. Doing so would be particularly chaotic for Chamber members who operate

25     across the country, but would be problematic even for those operating in a more restricted

26     geographic area, who may be forced to follow different rules in Seattle than, for example,

COMPLAINT - 22

1  Tacoma.  The NLRA was enacted to eliminate, rather than impose, such significant burdens on

2  commerce.

3        78.    In addition to covering those whom Congress did not intend should be covered,

4  the Ordinance imposes other requirements that are antithetical to the NLRA's comprehensive

5  collective bargaining scheme.  In particular, Congress has explicitly left unregulated both the

6  terms of collective bargaining agreements, and each side's use of economic leverage to convince

7  the other to reach agreement.  *NLRB v. Ins. Agents' Int'l Union*, 361 U.S. 477, 485–89 (1960).

8  The Ordinance regulates both:  it regulates the terms of collective bargaining agreements by

9  permitting the Director to disapprove of the parties' negotiated agreement, and it regulates each

10  side's use of economic leverage by requiring interest arbitration and imposing substantial

11  monetary penalties for failures to comply with certain of its provisions.

12        79.    In sum, the Ordinance conflicts with federal labor policy as embodied in the

13  NLRA because it imposes a collective-bargaining scheme on independent contractors, whose

14  labor practices Congress intended should remain unregulated, and also regulates both the content

15  of collective bargaining agreements and the economic leverage each side may use in reaching

16  agreement, both of which are unregulated by the NLRA.  The Ordinance is therefore preempted.

17  **COUNT FOUR:  *GARMON* PREEMPTION UNDER THE**
18  **NATIONAL LABOR RELATIONS ACT**

19        80.    Plaintiff incorporates by reference the allegations contained in all the preceding

20  paragraphs.

21        81.    The Supremacy Clause of the United States Constitution provides that federal law

22  is the "supreme Law of the Land" and therefore it preempts state and local laws that interfere

23  with or are contrary to federal law.  U.S. Const. art. VI, cl. 2.

24        82.    The principal federal statute regulating labor relations is the National Labor

25  Relations Act, 29 U.S.C. § 151 *et seq.*  The NLRA sets forth the rules governing employees'

26

COMPLAINT - 23

1   rights to bargain collectively with their employer regarding the terms and conditions of
2   employment, and proscribes as unfair labor practices certain activities by both employers and
3   labor organizations. *See* 29 U.S.C. §§ 157, 158.

4       83.     The NLRA also preempts state resolution of issues committed to the exclusive
5   jurisdiction of the National Labor Relations Board, as well as state regulation of any activity
6   arguably protected or prohibited by Sections 7 and 8 of the NLRA. *San Diego Building Trades*
7   *Council v. Garmon*, 359 U.S. 236 (1959).

8       84.     An individual need only be "arguably" covered by the NLRA in order for a state's
9   regulation of that individual to be preempted. *Id.* at 247; *see also Bud Antle, Inc. v. Barbosa*, 45
10   F.3d 1261 (9th Cir. 1994).

11      85.     On its face, the Ordinance does not apply to individuals who are employees under
12   the NLRA; it applies only to independent contractors. *See* § 6 ("The provisions of this
13   Ordinance do not apply to drivers who are employees under 29 U.S.C. § 152(3)").

14      86.     To determine whether a driver coordinator has complied with the Ordinance's
15   requirement to provide a QDR with a list of covered drivers, and has otherwise complied with
16   the Ordinance's provisions, the Director will be required to determine whether the drivers at
17   issue are "employees" under the NLRA and are thus exempt from the Ordinance's coverage, or
18   whether they are independent contractors and within the Ordinance's scope. *See* § 6; § 3(M).
19   This determination is subject to judicial review in the state courts. *Id.*, § 3(M).   The
20   determination, however, of whether an individual is subject to the NLRA is one that Congress
21   left to the exclusive jurisdiction of the NLRB. *See, e.g., Marine Eng'rs Beneficial Ass'n v.*
22   *Interlake Steamship Co.*, 370 U.S. 173 (1962) (determination as to whether individuals are
23   supervisors exempt from NLRA coverage is within the NLRB's exclusive jurisdiction).

24      87.     The NLRB has not definitively resolved the employee status of drivers who
25   receive ride requests from software applications and, indeed, as to certain drivers, that issue is
26   currently pending before the NLRB.   Therefore, the Ordinance injects the state courts into

COMPLAINT - 24

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
Telephone (206) 624-0900

1    matters subject to the NLRB's exclusive jurisdiction, and presently pending before the NLRB,

2    before the NLRB has resolved the question.  As a result, the Ordinance is preempted by federal

3    labor law.  *See Marine Eng'rs Beneficial Ass'n*, 370 U.S. at 185 ("The need for protecting the

4    exclusivity of NLRB jurisdiction is obviously greatest when the precise issue brought before a

5    court is in the process of litigation through procedures originating in the Board.  While the

6    Board's decision is not the last word, it must assuredly be the first.").

7          88.    Section 8(e) of the NLRA prohibits agreements between labor organizations and

8    employers where the employer agrees "to cease doing business with any other person."  29

9    U.S.C.  § 158(e).    Section 8(b)(4) of the NLRA prohibits a labor organization from

10    "threaten[ing], coerc[ing], or restrain[ing] any person engaged in commerce or in an industry

11    affecting commerce" for the purpose of "forcing or requiring . . . a self-employed person to join

12    any labor or employer organization or to enter into any agreement which is prohibited by

13    subsection (e) of this section" or "forcing or requiring any person . . . to cease doing business

14    with any other person . . ." 29 U.S.C. § 158(b)(4).

15          89.    The Ordinance requires driver coordinators to enter into agreements with EDRs

16    that will prevent driver coordinators from doing business with drivers who choose not to be

17    represented by, or who choose not to work under the terms of agreements negotiated by, the

18    EDRs.  The Ordinance also permits agreements that would force self-employed drivers to

19    become members of an EDR should they wish to contract with a particular driver coordinator.

20    By requiring such agreements, which arguably violate Sections 8(e) and 8(b)(4) of the NLRA,

21    the Ordinance is preempted by federal labor law.

22               **COUNT FIVE:  VIOLATION OF FEDERAL RIGHTS, 42 U.S.C. § 1983**

23          90.    Plaintiff incorporates by reference the allegations contained in all the preceding

24    paragraphs.

25

26

COMPLAINT - 25

1      91.    Federal law provides a civil cause of action to any person who is deprived by

2  another, acting under color of state law, of rights or privileges guaranteed by the Constitution or

3  laws of the United States. *See* Rev. Stat. § 1979, 42 U.S.C. § 1983.

4      92.    Defendants, acting under color of state and local law, and through their

5  enactment, threatened enforcement, and enforcement of the Ordinance as alleged herein, have

6  deprived Plaintiff's members of their rights under the NLRA to be free from "governmental

7  interference with the collective-bargaining process," *Golden State Transit Corp. v. City of Los*

8  *Angeles*, 493 U.S. 103, 109 (1989), and their rights under the antitrust laws to be free from

9  combinations and conspiracies in restraint of trade.

10     93.    Pursuant to 28 U.S.C. § 2201 and 42 U.S.C. § 1983, Plaintiff is therefore entitled

11  to a declaration that Defendants, by their enactment, threatened enforcement, and enforcement of

12  the Ordinance, have violated the rights of Plaintiff's members under the NLRA and the federal

13  antitrust laws.

14     94.    As a further result of Defendants' violation of the rights of Plaintiff's members as

15  alleged herein, Plaintiff is entitled to an award of its attorneys' fees pursuant to 42 U.S.C.

16  § 1988.

17
**COUNT SIX:  MUNICIPAL ACTION UNAUTHORIZED
BY WASHINGTON LAW**
18

19     95.    Plaintiff incorporates by reference the allegations contained in all the preceding

20  paragraphs.

21     96.    The authority of a municipality in Washington "is limited to those powers

22  expressly granted and to powers necessary or fairly implied in or incident to the power expressly

23  granted" by state law. *Arborwood Idaho, LLC v. City of Kennewick*, 89 P.3d 217, 225 (Wash.

24  2004).

25     97.    The Ordinance is not authorized by the Washington state statutes upon which the

26  City relied to pass it.  Those statutes allow local regulation of for-hire vehicles operating within

COMPLAINT - 26

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
Telephone (206) 624-0900

1   their jurisdiction, including:  (a) regulating entry into the business and licensure; (b) controlling

2   rates charged to riders for transportation services; (c) regulating routes traveled by for-hire

3   vehicles; (d) establishing safety and equipment requirements; and (e) other requirements

4   necessary to ensure safe and reliable for-hire transportation service.  *See* R.C.W. § 46.72.160

5   (for-hire vehicles); R.C.W. § 81.72.210 (taxis).

6        98.    The Ordinance goes beyond the enumerated grants of regulatory power in R.C.W.

7   §§ 46.71.160 and 81.72.210.  First, the Ordinance attempts to regulate third-party businesses that

8   independently contract with the drivers of for-hire vehicles, but the City has no such authority.

9   Second, the Ordinance attempts to require collective bargaining for wages, hours and working

10   conditions of for-hire drivers, but the City has no such authority.

11        99.    Accordingly, the City lacks authority to promulgate and enforce the Ordinance.

12              **COUNT SEVEN:  VIOLATION OF WASHINGTON**
13                     **CONSUMER PROTECTION ACT**

14        100.    Plaintiff incorporates by reference the allegations contained in all the preceding

15   paragraphs.

16        101.    Washington's Consumer Protection Act prohibits "[e]very contract, combination,

17   in the form of trust or otherwise, or conspiracy in restraint of trade or commerce."  R.C.W.

18   § 19.86.030.

19        102.    As with the Sherman Act, horizontal price fixing is a per se violation of the

20   Consumer Protection Act.  *See Ballo v. James S. Black Co.*, Inc., 692 P.2d 182, 186 (Wash. Ct.

21   App. 1984).

22        103.    The Ordinance unlawfully authorizes for-hire drivers to engage in *per se* illegal

23   concerted action by forming a cartel (under the aegis of a QDR), speaking as a single unit

24   through an exclusive representative (an EDR), and engaging in horizontal fixing of prices and

25   contractual terms.  And it requires driver coordinators to participate in such activity by

26   compelling them to bargain over the price and terms for which the independent contractors'

COMPLAINT - 27

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
*Telephone (206) 624-0900*

1  services will be offered to the public and forbidding any driver from entering into a different

2  arrangement with a driver coordinator with whom he contracts.

3      104.    By purporting to authorize concerted anticompetitive conduct in violation of the

4  Consumer Protection Act, and by placing pressure on private parties to violate the Consumer

5  Protection Act in order to comply with the Ordinance, the Ordinance conflicts with and is

6  preempted by the Consumer Protection Act.

7      105.    Plaintiff's members will suffer injury as a direct result of the Ordinance's restraint

8  of competition.  For example, under the Ordinance, unions such as the Teamsters will seek to

9  reduce the prices paid to app-based companies for the use of their ride referral applications.  As a

10  result of the collective-bargaining process, those companies also will incur additional costs of

11  doing business with the conspirators, such as reimbursement of driver's expenses or payment of

12  other benefits.  Traditional for-hire companies that provide dispatch services for independent-

13  contractor drivers will suffer similar injuries, as they will be forced to accept reduced prices and

14  incur additional costs for offering dispatch service to drivers.  All of these increased costs, which

15  are due to decreased competition among independent contractors, threaten the viability of

16  companies that provide ride referral services.  And ultimately, the decrease in competition will

17  harm consumers, who will pay more for personal transportation.

18      106.    The state-action provision does not immunize the anticompetitive conduct that the

19  Ordinance compels.  *See* R.C.W. § 19.86.160.  Under Washington law, the state-action provision

20  must be construed narrowly, and municipalities cannot authorize anticompetitive conduct by

21  private parties absent clear and express authorization from the State.  *Robinson v. Avis Rent A*

22  *Car System*, 22 P.3d 818, 821-23 (Wash. Ct. App. 2001).  The City has no authorization from the

23  State to authorize independent drivers to fix prices and to compel driver coordinators to

24  participate in that collusion.

25

26

COMPLAINT - 28

82928787.1 0057817-00001

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
*Telephone (206) 624-0900*

**COUNT EIGHT:  VIOLATION OF WASHINGTON PUBLIC RECORDS ACT**

107.   Plaintiff incorporates by reference the allegations contained in all the preceding paragraphs.

108.   Washington's Public Records Act prohibits disclosure of public records that are protected by any "other statute which exempts or prohibits disclosure of specific information or records." R.C.W. § 42.56.070(1).

109.   Washington's Trade Secret Act is an "other statute" that prohibits disclosure of trade secrets. *See* R.C.W. § 19.108.010(4).

110.   The Ordinance compels driver coordinators to provide "all QDRs" with "the names, addresses, email addresses (if available), and phone number (if available) of all qualifying drivers they hire, contract with, or partner with." Ordinance § 3(D).

111.   The lists of driver information held by the Chamber's members are trade secrets because they (1) contain a compilation of information that (2) "derives independent economic value" from not being known to competitors, and (3) prior to the Ordinance, the information had been a closely guarded secret. R.C.W. § 19.108.010(4).

112.   Under the Ordinance, the driver lists are "public records." R.C.W. § 42.56.010. For example, they contain "information relating to" the City's collective bargaining scheme, which is a "governmental or proprietary function," and they are "used" by the City to implement the collective bargaining scheme. *Id.*

113.   The Ordinance conflicts with and is preempted by the Public Records Act because the Ordinance compels disclosure of the driver lists, which are trade secrets contained in public records and are protected from disclosure under R.C.W. § 42.56.070(1).

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff asks for judgment against Defendants, and respectfully prays that the Court:

COMPLAINT - 29

82928787.1 0057817-00001

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
Telephone (206) 624-0900

1    A.    Issue a judgment declaring that Seattle City Ordinance No. 118499 (Municipal

2    Code Ch. 6.310.735) is unenforceable in its entirety because it:

3         1.    Violates and is preempted by the Sherman Antitrust Act as an unlawful

4    restraint of trade and not exempt from the antitrust laws by virtue of state action immunity or

5    immunity under the statutory and non-statutory labor exemptions to the antitrust laws;

6         2.    Is preempted by the National Labor Relations Act in that it attempts to

7    regulate the activity of independent contractors that Congress intended should go unregulated by

8    labor law; it attempts to regulate other aspects of employment, such as the content of collective

9    bargaining agreements and the use of economic leverage in negotiations, that Congress intended

10   should remain unregulated; it requires the Director and Washington State courts to resolve issues

11   committed to the exclusive jurisdiction of the National Labor Relations Board; and it requires

12   driver coordinators to enter into agreements that are arguably prohibited by Section 8 of the

13   National Labor Relations Act; and

14        3.    Violates the rights of Plaintiff secured by the Constitution and laws of the

15   United States; and

16        4.    Is unauthorized by R.C.W. §§ 46.71.160 and 81.72.210, and, as such, the

17   City had no authority to enact it; and

18        5.    Violates and is preempted by the Washington Consumer Protection Act

19   because the Ordinance authorizes an illegal conspiracy in restraint of trade; and

20        6.    Violates and is preempted by the Washington Public Records Act.

21   B.    Permanently enjoin Defendants from implementing, enforcing or otherwise

22   applying the Ordinance;

23   C.    Award costs and attorneys' fee pursuant to any applicable statute or authority; and

24   ///

25   ///

26   ///

COMPLAINT - 30

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
Telephone (206) 624-0900

1    D.    Issue such other relief as the Court may deem just and appropriate.

2    Dated:  March 3, 2016

3                                              Respectfully submitted,

4

5                                              By:____s/ Timothy J. O'Connell_____

6    Lily Fu Claffee                          Timothy J. O'Connell, WSBA 15372
     (D.C. Bar No. 450502)                    STOEL RIVES LLP
7    (pro hac vice pending)                   600 University Street, Suite 3600
                                              Seattle, WA 98101
8    Steven P. Lehotsky                       (206) 624-0900
     (D.C. Bar No. 992725)                    (206) 386-7500 FAX
9    (pro hac vice pending)                   Tim.oconnell@stoel.com

10   Warren Postman
     (D.C. Bar. No. 995083)                   Noel J. Francisco
11   (pro hac vice pending)                   (D.C. Bar No. 464752)
                                              (pro hac vice pending)
12   U.S. CHAMBER LITIGATION CENTER
     1615 H Street, N.W.                      Jacqueline M. Holmes
13   Washington, D.C. 20062                   (D.C. Bar No. 450357)
     (202) 463-3187                           (pro hac vice pending)
14   slehotsky@uschamber.com
                                              Christian G. Vergonis
15                                            (D.C. Bar No. 483293)
                                              (pro hac vice pending)
16
                                              Robert Stander
17                                            (D.C. Bar No. 1028454)
                                              (pro hac vice pending)
18
                                              JONES DAY
19                                            51 Louisiana Avenue, N.W.
                                              Washington, D.C.  20001
20                                            (202) 879-3939
                                              (202) 616-1700 FAX
21                                            nfranscisco@jonesday.com

22                                            ATTORNEYS FOR PLAINTIFF

23

24

25

26

COMPLAINT - 31