HONORABLE ROBERT S. LASNIK

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

CHAMBER OF COMMERCE OF THE
UNITED STATES OF AMERICA,

              *Plaintiff*,

    v.

CITY OF SEATTLE, *et al.*,

              *Defendants*.

Case No. 2:16-cv-00322 RSL

PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTION TO
DISMISS

OPPOSITION TO MOTION TO DISMISS
Case No. 2:16-cv-00322 RSL

1

## TABLE OF CONTENTS

2

**Page**

3  TABLE OF AUTHORITIES .................................................................................................. ii

   INTRODUCTION ............................................................................................................... 1

4  BACKGROUND ................................................................................................................ 2

5  ARGUMENT ..................................................................................................................... 5

6  I.    THE CHAMBER HAS ASSOCIATIONAL STANDING............................................. 5

         A.    Several Of The Chamber's Members Have Standing To Bring This Suit............ 5

7              1.    The Chamber's Members Are Currently Suffering Injury And Face
                     A Substantial Risk Of Future Injury ...................................................... 6

8              2.    These Injuries Are Traceable To The Defendants And Redressable
9                    Through A Favorable Ruling From This Court ...................................... 18

10       B.    The Chamber's Purpose Is To Advance The Interests At Issue In This Suit ...... 19

         C.    This Suit Does Not Require The Participation Of The Chamber's
11             Members .................................................................................................... 19

12             1.    Individual participation is unnecessary for the antitrust claims............... 20

13             2.    Individual participation is unnecessary for the *Garmon* claim............... 21

               3.    Individual participation is unnecessary for the PRA claim .................... 21

14  II.   THE SO-CALLED PRUDENTIAL RIPENESS DOCTRINE PROVIDES NO
          BASIS FOR REFUSING TO EXERCISE JURISDICTION ........................................ 22

15        A.    The Chamber's Claims Are Fit For Judicial Review............................................. 23

16        B.    Chamber Members Will Suffer Substantial Hardship If Review Is
                Deferred ...................................................................................................... 23

17  CONCLUSION.................................................................................................................. 24

18

19

20

21

22

23

24

25

26

OPPOSITION TO MOTION TO DISMISS - i
Case No. 2:16-cv-00322 RSL

**STOEL RIVES LLP**
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
*Telephone (206) 624-0900*

1

## TABLE OF AUTHORITIES

2

**Page(s)**

3

CASES

4

*Alaska Airlines, Inc. v. City of Long Beach,*
   951 F.2d 977 (9th Cir. 1991) ............................................................................17

5

6

*Already, LLC v. Nike, Inc.,*
   133 S. Ct. 721 (2013)...................................................................................15

7

*Arizona. v. Atchison, Topeka & Santa Fe R.R.,*
   656 F.2d 398 (9th Cir. 1981) ..............................................................................9

8

9

*Aspen Grove Owners Ass'n v. Park Promenade Apartments, LLC,*
   No. 09 Civ. 1110, 2010 WL 4860345 (W.D. Wash. Nov. 19, 2010) .....................21

10

11

*Auto. Workers v. Brock,*
   477 U.S. 274 (1986)............................................................................19, 21

12

13

*Babbitt v. United Farm Workers Nat'l Union,*
   442 U.S. 289 (1979)...................................................................... *passim*

14

15

*Big Bear Lodging Ass'n v. Snow Summit, Inc.,*
   182 F.3d 1096 (9th Cir. 1999) ..........................................................................23

16

17

*Bland v. Fessler,*
   88 F.3d 729 (9th Cir. 1996) ...................................................................7, 9, 11

18

19

*Cal. Pro-Life Council, Inc. v. Getman,*
   328 F.3d 1088 (9th Cir. 2003) ..........................................................................11

20

21

*Cannabis Action Coal. v. City of Kent,*
   351 P.3d 151 (Wash. 2015)................................................................................20

22

23

*Chamber of Commerce v. Brown,*
   554 U.S. 60 (2008)..........................................................................................12

24

25

*City of Oakland v. Lynch,*
   798 F.3d 1159 (9th Cir. 2015) ..........................................................................17

26

OPPOSITION TO MOTION TO DISMISS - ii
Case No. 2:16-cv-00322 RSL

**STOEL RIVES** LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
*Telephone (206) 624-0900*

*Clapper v. Amnesty Int'l USA*,
    133 S. Ct. 1138 (2013) ................................................................12, 13, 14

*Davis v. FEC*,
    554 U.S. 724 (2008) ...........................................................................15, 16

*Ex Parte Young*,
    209 U.S. 123 (1908) ....................................................................................20

*Friends of Earth, Inc. v. Laidlaw Envt'l Servs. (TOC), Inc.*,
    528 U.S. 167 (2000) ....................................................................................13

*Holder v. Humanitarian Law Project*,
    561 U.S. 1 (2010) .........................................................................................8

*Hunt v. Wash. State Apple Advert. Comm'n*,
    432 U.S. 333 (1977) ................................................................................5, 19

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
    134 S. Ct. 1377 (2014) ..............................................................................22

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ................................................................................6, 18

*Marine Eng'rs v. Interlake S.S. Co.*,
    370 U.S. 173 (1962) ....................................................................................21

*MedImmune, Inc. v. Genentech, Inc.*,
    549 U.S. 118 (2007) ................................................................7, 9, 11, 15

*Meese v. Keene*,
    481 U.S. 465 (1987) ....................................................................................13

*Mendia v. Garcia*,
    768 F.3d 1009 (9th Cir. 2014) ..............................................................12, 14

*Monsanto Co. v. Geertson Seed Farms*,
    561 U.S. 139 (2010) ....................................................................................13

*NAACP v. Patterson*,
    357 U.S. 449 (1958) ....................................................................................15

OPPOSITION TO MOTION TO DISMISS
Case No. 2:16-cv-00322 RSL

*Narayanan v. British Airways*,
  747 F.3d 1125 (9th Cir. 2014) ..................................................................18

*Nat'l Constructors Ass'n v. Nat'l Elec. Contractors Ass'n, Inc.*,
  498 F. Supp. 510 (D. Md. 1980) ..................................................................20

*Nat'l Family Planning & Reproductive Health Ass'n, Inc. v. Gonzales*,
  468 F.3d 826 (D.C. Cir. 2006) ..................................................................14

*Ohio Civil Rights Comm'n v. Dayton Christian Sch., Inc.*,
  477 U.S. 619 (1986) ..................................................................7

*Reg'l Rail Reorganization Act Cases*,
  419 U.S. 102 (1974) ..................................................................9

*S.W. Suburban Bd. of Realtors, Inc. v. Beverly Area Planning Ass'n*,
  830 F.2d 1374 (7th Cir. 1987) ..................................................................20

*San Diego County Gun Rights Committee v. Reno*,
  98 F.3d 1121 (9th Cir. 1996) ..................................................................10, 11

*Sprint Comms., Inc. v. Jacobs*,
  134 S. Ct. 584 (2013) ..................................................................22

*Susan B. Anthony List v. Driehaus*,
  134 S. Ct. 2334 (2014) .................................................................. *passim*

*Thomas v. Anchorage Equal Rights Commission*,
  220 F.3d 1134 (9th Cir. 1999) ..................................................................10, 11

*United Food & Commercial Workers v. Brown Group, Inc.*,
  517 U.S. 544 (1996) ..................................................................19

*Valle del Sol, Inc. v. Whiting*,
  732 F.3d 1006 ..................................................................11

*Virginia v. Am. Booksellers Ass'n*,
  484 U.S. 383 (1988) ..................................................................8

*Warth v. Seldin*,
  422 U.S. 490 (1975) ..................................................................5, 21

OPPOSITION TO MOTION TO DISMISS
Case No. 2:16-cv-00322 RSL

1

**STATUTES**

2    5 U.S.C. § 702 ................................................................................................21

3    15 U.S.C. § 26 ................................................................................................20

4

5    29 U.S.C. § 152(3) .........................................................................................21

6    33 U.S.C. § 1365(a) .......................................................................................21

7    33 U.S.C. § 1365(g) .......................................................................................21

8    42 U.S.C. § 1983 ...........................................................................................21

9    Public Records Act ...................................................................................21, 22

10    Seattle Code § 6.310.110 ..................................................................................4

11    Seattle Ordinance 124968 ........................................................................ *passim*

12    Wash. Rev. Code § 19.86.090 .........................................................................20

13    Washington Trade Secrets Act, Wash. Rev. Code § 19.108.010(4) .............................22

14

15

**OTHER AUTHORITIES**

16    Daniel Beekman, *An Uber Union? Seattle Could Clear Way For Ride-App*

17        *Drivers*, Seattle Times (Nov. 28, 2015), goo.gl/oapjuV ........................................3, 16

18    Daniel Beekman, *City Council Member Says Let Uber Drivers Unionize*, Seattle

19        Times (Aug. 31, 2015), goo.gl/BybwbH ................................................................3

20    Teamsters 117 Registration Page, Wash. Sec'y of State, goo.gl/RTw12j ...................16

21    U.S. Dep't of Labor, goo.gl/wMufaV ................................................................16

22

23

24

25

26

OPPOSITION TO MOTION TO DISMISS
Case No. 2:16-cv-00322 RSL

1                                           **INTRODUCTION**

2        The City concedes that the Ordinance is going into effect, informing the Court of its

3 planned timeline and stating that it is "working to implement the Ordinance" and expects to set a

4 "Commencement Date" by September 19, 2016.  Decl. of Douglas Carey ¶ 4, Dkt. 32.  The City

5 likewise refused a request by counsel for Plaintiff the Chamber of Commerce of the United

6 States of America, made before it commenced this lawsuit, to provide assurances that the City

7 would not implement or enforce the Ordinance.  Compl. ¶ 43.  There is, therefore, no question

8 that this Court will, in just a few months, be required to adjudicate this suit on the merits.  And

9 no factual development between now and then is needed in order to decide the purely legal

10 claims raised by the Chamber.  Yet the City's motion asks the Court to forestall any such

11 adjudication until November 16, 2016, when unions will demand driver lists, at which point this

12 Court will have just sixteen days to resolve this case—unless the City agrees to stay enforcement

13 of the Ordinance pending litigation—before the Chamber's members are required to turn over

14 those driver lists on December 2.  Carey Decl. ¶ 5.

15        There is no need to create an artificial emergency.  This Court has ample authority to

16 resolve this case now, and the merits of the Chamber's purely legal claims may be briefed

17 starting now on a reasonable schedule for the parties that also permits sufficient time for the

18 Court to rule.  And that is particularly true where, as here, the suit will, even under the City's

19 erroneous view of the law, undoubtedly be well positioned for review by the time the merits of

20 the matter are fully briefed, argued, and ready for decision.

21        The key issue for Article III associational standing and ripeness, which amount to the

22 same thing here, is that the Chamber's members are facing several present or imminent injuries.

23 These members are suffering actual, ongoing injuries such as (i) coerced compliance with the

24 Ordinance's anti-retaliation provision; and (ii) reasonable expenditures required to prepare for

25 the Ordinance's operation and mitigate its harmful effects, including educating drivers about the

26 impact of unionization and hiring labor relations consultants and attorneys.  And they face

OPPOSITION TO MOTION TO DISMISS - 1
Case No. 2:16-cv-00322 RSL

1    imminent future injuries such as (i) forced disclosure of confidential driver lists; and (ii) forced

2    participation in the City's collective-bargaining regime.  These injuries are fairly traceable to the

3    Ordinance's enforcement, and a favorable ruling from this Court will provide redress.  The other

4    requirements of associational standing are met because this lawsuit is germane to the Chamber's

5    purposes, and none of the Chamber's claims—all of which are facial challenges seeking

6    prospective injunctive relief—requires the individual participation of the Chamber's members.

7        Accordingly, this Court should reject the City's request to delay this case until it may be

8    adjudicated only on an emergency basis and, instead, hold that this case is ripe for adjudication.

9                                    **BACKGROUND**

10       **a.**       This suit challenges Seattle Ordinance 124968, which compels businesses that

11   contract with for-hire drivers to collectively bargain the terms of those contracts.  The Chamber

12   alleges that the Ordinance is preempted by the Sherman Act and the National Labor Relations

13   Act and is inconsistent with state law.  The Chamber is the world's largest business association,

14   representing the interests of more than three million businesses.  Decl. of Amanda Engstrom

15   Eversole ¶ 3.  Its purpose is to advocate on behalf of its members for policies that create jobs and

16   promote economic growth.  *Id.* ¶ 4.

17       The Chamber has members subject to the Ordinance.  First, Chamber member Uber

18   Technologies, Inc., along with its wholly owned subsidiaries Uber USA, LLC and Rasier, LLC

19   (collectively, "Uber"), is a technology company that connects individuals looking for

20   transportation ("riders") with independent transportation providers looking for passengers

21   ("drivers").  Decl. of Mitchel Matthews ¶ 3.  Uber's product is a smartphone application, the

22   Uber App, which allows riders and drivers to connect based on their location.  *Id.*  For-hire

23   drivers who use the Uber App to generate referrals are independent contractors, not Uber

24   employees.  *Id.* ¶ 15–16.  They use the Uber App to generate leads for their businesses.  *Id.* ¶ 8.

25   Uber contracts with more than fifty for-hire drivers in the Seattle area.  *Id.* ¶ 16.

26       Second, Chamber member Eastside for Hire ("Eastside") provides dispatch services in

OPPOSITION TO MOTION TO DISMISS - 2
Case No. 2:16-cv-00322 RSL

1    the Seattle area.  Decl. of Samatar Guled ¶ 2.  Eastside uses advertising and preexisting client

2    bases to generate transportation requests from passengers, who call, text, or email to request a

3    ride, and refers these requests to drivers via mobile data terminal.  *Id.* ¶ 5.  Eastside contracts

4    with more than fifty drivers, who are independent contractors, not employees.  *Id.* ¶¶ 4,7.

5          **b.**      The Ordinance's legislative sponsor, Seattle Councilmember Mike O'Brien,

6    proposed the bill as "a plan to help independent contractors such as Uber drivers unionize in

7    pursuit of better working conditions and pay."  Daniel Beekman, *City Council Member Says Let*

8    *Uber Drivers Unionize*, Seattle Times (Aug. 31, 2015), goo.gl/BybwbH.  To craft the legislation,

9    O'Brien partnered with Teamsters Local 117, which had also been "providing assistance" to

10   Seattle's App-Based Drivers Association.  *Id.*; Decl. of Harry Korrell, Ex. H.  Teamsters

11   representatives frequently contacted O'Brien, other councilmembers, and the mayor's office

12   during the legislative process.   Korrell Decl., Exs. A, C, D, E, F, G, H.  Together, the "hard-

13   charging union and . . . ambitious City Council member" designed the Ordinance specifically to

14   target "app-based ride-dispatch companies, including Uber and Lyft."[1]  Daniel Beekman, *An*

15   *Uber Union? Seattle Could Clear Way For Ride-App Drivers*, Seattle Times (Nov. 28, 2015),

16   goo.gl/oapjuV.  O'Brien's stated purpose was "to balance the playing field" between Uber and

17   "drivers making less than minimum wage."  *Id.*  The Ordinance resulted from this coordinated

18   effort, and became law on January 22, 2016.  *See* Mot. at 1 n.1.

19         The Ordinance requires "driver coordinators" to collectively bargain with "for-hire

20   drivers."  Ordinance § 1(I).  A "driver coordinator" is "an entity that hires, contracts with, or

21   partners with for-hire drivers for the purpose of assisting them with, or facilitating them in,

22   providing for-hire services to the public."  Ordinance § 2.  Driver coordinators include, but are

23   not limited to, "taxicab associations, for-hire vehicle companies, and transportation network

24   _____

25        [1] Lyft, Inc., is a competing technology company that provides digital ride-referral
     services and contracts with more than fifty drivers in the Seattle area.  Like Uber, Lyft's product

26   is a smartphone application that connects potential riders with for-hire drivers.

OPPOSITION TO MOTION TO DISMISS - 3
Case No. 2:16-cv-00322 RSL

1   companies." *Id.* A "transportation network company" is defined elsewhere in the City Code as

2   an organization that uses "an online-enabled . . . application or platform to connect passengers

3   with drivers using their personal vehicles." Seattle Code § 6.310.110. The Ordinance does "not

4   apply to drivers who are employees" under the National Labor Relations Act. Ordinance § 6.

5   As such, it mandates collective bargaining for independent contractors, but not employees.

6     Certain requirements of the Ordinance go into effect automatically. For example, the

7   anti-retaliation provision, which takes effect on June 20, 2016, *see id.* § 5, decrees that a "driver

8   coordinator shall not retaliate against any for-hire driver for exercising the right to participate in"

9   collective bargaining, "or provide or offer to provide money or anything of value to any for-hire

10  driver with the intent of encouraging the for-hire driver to exercise, or to refrain from exercising,

11  that right." *Id.* § 3(K). Defendant Director Fred Podesta, who is responsible for enforcing the

12  Ordinance, *id.* § 3(M)(1), may punish violations with a "daily penalty of up to $10,000." *Id.*

13  § 3(M)(1)(d). "Any aggrieved party" may also sue for "all remedies available at law or in

14  equity," as well as "attorney's fees and costs." *Id.* § 3(M)(3).

15    Other requirements are triggered by forthcoming required events. Within thirty days of

16  its "commencement date," which the Director "shall" set between July 20 and September 18,

17  2016, *id.* at § 3(A), a union may notify the Director of its desire to represent for-hire drivers

18  within the City. *Id.* § 3(C). The Director has fourteen days to determine whether to designate

19  that union as a "Qualified Driver Representative" (QDR). *Id.* § 3(C); *see also id.* § 3(B)

20  (designation based on, *inter alia*, applicant's non-profit status, membership bylaws, and

21  experience in or commitment to collective bargaining). Once designated as a QDR, the union

22  has fourteen days to notify any driver coordinator whose drivers the union wishes to represent

23  that it intends to become the "Exclusive Driver Representative" (EDR) for those drivers. *Id.*

24  § 3(C)(2). The union's notice triggers the Ordinance's mandatory disclosure provision, which

25  requires the driver coordinator within seventy-five days of the commencement date to provide

26  the union with "the names, addresses, email addresses (if available), and phone number (if

OPPOSITION TO MOTION TO DISMISS - 4
Case No. 2:16-cv-00322 RSL

1    available) of all qualifying drivers they hire, contract with, or partner with." *Id.* § 3(D); *see also*

2    *id.* (disclosure requirement applies to driver coordinators who contracted with "50 or more for-

3    hire drivers in the 30 days prior" to the commencement date).  QDRs are authorized to use this

4    contact information to conduct a "card check"-style organizing campaign, *i.e.*, to contact drivers

5    to solicit their interest in being represented by the QDR. *See id.* § 3(E).

6         If a majority of the drivers for a driver coordinator provide statements of interest

7    indicating support for the QDR, the Director must certify the union as the EDR. *Id.* § 3(F).  (If

8    no EDR is certified for a particular driver coordinator, the union may reinitiate the process every

9    twelve months. *Id.* § 3(G).)  The driver coordinator must then "meet and negotiate in good faith"

10   with the EDR over the terms and conditions of its contracts with for-hire drivers, *id.* § 3(H), and,

11   if no agreement is reached, must submit to binding arbitration, *id.* § 3(I).

12                                    **ARGUMENT**

13   **I.      THE CHAMBER HAS ASSOCIATIONAL STANDING**

14        An association has standing to bring suit on behalf of its members when (A) "its

15   members would otherwise have standing to sue in their own right"; (B) "the interests it seeks to

16   protect are germane to the organization's purpose"; and (C) "neither the claim asserted nor the

17   relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash.*

18   *State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).  The Chamber satisfies these criteria.

19        **A.      Several Of The Chamber's Members Have Standing To Bring This Suit**

20        The Chamber has several members, including Uber, Eastside, and Q for Hire, who are

21   subject to the Ordinance's driver-disclosure and collective-bargaining requirements. *See supra*

22   pp. 2–3; Eversole Decl. ¶ 5.  Thus even assuming that the Chamber must identify any injured

23   members by name, as Defendants contend (Mot. at 18–19), the Chamber has timely done so. *See*

24   *Warth v. Seldin*, 422 U.S. 490, 501–02 (1975).

25        Defendants assert that even companies subject to the Ordinance lack standing to sue in

26   their own right and that the claims are not ripe.  Standing and ripeness "originate from the same

OPPOSITION TO MOTION TO DISMISS - 5
Case No. 2:16-cv-00322 RSL

**STOEL RIVES** LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
*Telephone (206) 624-0900*

1   Article III limitation," and both issues "in this case boil down to the same question"—whether

2   the Chamber has alleged that its members are subject to an actual or imminent injury. *Susan B.*

3   *Anthony List v. Driehaus*, 134 S. Ct. 2334, 2341, 2341 n.5 (2014) (quotation marks omitted).

4   Indeed, Defendants restate the same arguments in challenging both standing and ripeness.

5   *Compare* Mot. at 8, *with id.* at 14. Consistent with the Supreme Court's frequent practice, the

6   Chamber "use[es] the term 'standing'" in this brief. *Susan B. Anthony List*, 134 S. Ct. at 2341

7   n.5. By either name, Defendants' arguments fail.

8       "To establish Article III standing, a plaintiff must show (1) an 'injury in fact,' (2) a

9   sufficient 'causal connection between the injury and the conduct complained of,' and (3) a

10  'likel[ihood]' that the injury 'will be redressed by a favorable decision.'" *Id.* at 2341 (quoting

11  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)). To defeat a motion to dismiss, a

12  plaintiff may demonstrate standing through "general factual allegations" in the pleadings or

13  specific factual affidavits. *Lujan*, 504 U.S. at 561. The Chamber's members meet all three

14  elements. Most importantly, they are facing both ongoing, actual injuries and future injuries that

15  are certainly impending and pose a substantial risk of harm. Each injury alone is sufficient to

16  support standing. Each is also traceable to Defendants and redressable by a favorable ruling.

17          **1.      The Chamber's Members Are Currently Suffering Injury And Face A
                       Substantial Risk Of Future Injury**
18

19      A plaintiff must allege an injury that is "actual or imminent, not conjectural or

20  hypothetical." *Susan B. Anthony List*, 134 S. Ct. at 2341 (quotation marks omitted). "[O]ne does

    not have to await the consummation of threatened injury to obtain preventive relief." *Babbitt v.*
21
    *United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979). A future injury suffices "if the
22
    threatened injury is certainly impending, or there is a substantial risk that the harm will occur."
23
    *Susan B. Anthony List*, 134 S. Ct. at 2341 (quotation marks omitted).
24
        Two types of injury support standing here. *First*, the Chamber's members are currently
25
    incurring actual, ongoing injuries. These include (i) coerced compliance with the Ordinance's
26

OPPOSITION TO MOTION TO DISMISS - 6
Case No. 2:16-cv-00322 RSL

**STOEL RIVES** LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
*Telephone (206) 624-0900*

1   anti-retaliation provision, and (ii) the members' reasonable expenditures to prepare for the

2   operation of the Ordinance, such as educating drivers about the impact of unionization,

3   participating in rulemaking, and hiring consultants and attorneys for assistance with union

4   organizing and the collective-bargaining process.  *Second*, the Chamber's members face

5   imminent future injuries, including (i) forced disclosure of confidential commercial information

6   and (ii) forced participation in the City's collective-bargaining regime.

7                              **(a)**       **Present Harms**

8            **i.**        *Prohibition of non-unionization clauses.*  To protect its business from the burdens

9   of the Ordinance, Eastside wishes to amend its driver contracts to require drivers to decline union

10  representation for the purpose of collective bargaining.  Guled Decl. ¶ 11.  Eastside has refrained

11  from doing so because the Ordinance arguably prohibits such clauses:  it mandates that "a driver

12  coordinator shall not retaliate against any for-hire driver" nor "provide or offer to provide money

13  or anything of value" to encourage the "driver to exercise, or to refrain from exercising"

14  collective-bargaining rights under the Ordinance.  Ordinance § 3(K); Guled Decl. ¶ 11.  These

15  are precisely the circumstances giving an entity standing to obtain pre-enforcement review.

16           Prior to challenging a law, a plaintiff need not "first expose himself to actual arrest or

17  prosecution," *Babbitt*, 442 U.S. at 298, "administrative action threatening sanctions," *Ohio Civil*

18  *Rights Comm'n v. Dayton Christian Sch., Inc.*, 477 U.S. 619, 625 n.1 (1986), or "civil fines and

19  private enforcement actions," *Bland v. Fessler*, 88 F.3d 729, 737 (9th Cir. 1996).  Rather, a

20  plaintiff has standing to bring a pre-enforcement suit if it "has alleged an intention to engage in a

21  course of conduct" that is "arguably . . . proscribed by" the challenged law but also "arguably"

22  protected or lawful, "and there exists a credible threat of prosecution."  *Susan B. Anthony List*,

23  134 S. Ct. at 2342 (quoting *Babbit*, 442 U.S. at 298); *see also MedImmune, Inc. v. Genentech,*

24  *Inc.*, 549 U.S. 118, 128–29 (2007) ("[W]e do not require a plaintiff to expose himself to liability

25  before bringing suit to challenge the basis for [threatened government action].").  The Chamber's

26  members satisfy each of these conditions.

OPPOSITION TO MOTION TO DISMISS - 7
Case No. 2:16-cv-00322 RSL

**STOEL RIVES LLP**
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
*Telephone (206) 624-0900*

*First*, the Chamber has alleged its member's "intention to engage in a course of conduct" that is "arguably … proscribed by" the Ordinance. *Susan B. Anthony List*, 134 S. Ct. at 2343–44 (quoting *Babbitt*, 442 U.S. at 298); *see also* Compl. ¶ 46.  Chamber member Eastside wishes to include non-unionization provisions in its driver contracts.  Guled Decl. ¶ 11.  The Ordinance arguably bars these provisions because it prohibits promising a driver anything of value to refrain from exercising collective-bargaining rights, and because enforcing a non-unionization contract is arguably a retaliatory act.  Indeed, Defendants have asserted that, under the Ordinance, the Chamber's "members have no right to demand [non-unionization] agreements."  Mot. at 10 n.4.

*Second*, adopting the non-unionization provisions is "arguably" protected or lawful because, as the Complaint alleges, the Ordinance is arguably preempted by the Sherman Act and the NLRA and inconsistent with state law.  Thus, but for the unlawful Ordinance, Eastside would have the right to insist upon including these provisions in its driver contracts.

*Third*, the threat that the Ordinance will be enforced is "substantial," and not "imaginary or wholly speculative," because Defendants have refused to disavow its enforcement.  *Susan B. Anthony List*, 134 S. Ct. at 2343.  In *Babbitt*, a labor union challenged an Arizona statute that made it an unfair labor practice to "induce or encourage" agricultural purchases through "dishonest, untruthful and deceptive publicity."  442 U.S. at 301.  The union argued that to avoid prosecution it had to refrain from engaging in publicity campaigns, but the government responded that the provision had "not yet been applied and may never be applied to commissions of unfair labor practices."  *Id.* at 301–02.  The Court rejected the government's claim, explaining that enforcement was not "imaginary or wholly speculative" because "the State ha[d] not disavowed any intention of invoking the criminal penalty provision against unions that commit unfair labor practices."  *Id.*  The Supreme Court has repeatedly reaffirmed that conclusion.  *E.g.*, *Holder v. Humanitarian Law Project*, 561 U.S. 1, 16 (2010) ("The Government has not argued … that plaintiffs will not be prosecuted if they do what they say they wish to do."); *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 393 (1988) ("The State has not suggested that the newly

1   enacted law will not be enforced, and we see no reason to assume otherwise.").

2        Defendants have "not disavowed any intention" of enforcement.  *Babbitt*, 442 U.S. at 302.

3   To the contrary, they are willing only to state that "the City will provide an opportunity to correct

4   any violation before imposing penalties."  Mot. at 16–17.  But forcing Eastside to "correct any

5   violation" by abandoning non-unionization contracts does nothing to dispel the injury.

6   Defendants have actually affirmed that they *do* intend to compel the Chamber's members—

7   through threat of government sanctions of up to $10,000 per day—to comply with the anti-

8   retaliation provision.  Further, the Ordinance authorizes private plaintiffs to sue for damages, and

9   the City cannot control those suits.[2]

10       Defendants' contrary arguments are unpersuasive.  They first contend that the Chamber's

11  members lack standing because they are "voluntarily complying with the anti-retaliation

12  provisions of the Ordinance."  Mot. at 9.  To the contrary, because non-compliance will result in

13  government sanctions, Eastside's actions are not "voluntary."  A plaintiff does not lack standing

14  where he fails to "eliminat[e] the imminent threat of harm by simply not doing what he claimed

15  the right to do"—such as "enter into a lease" or enter into a non-unionization contract—because

16  "the threat-eliminating behavior [is] effectively coerced."  *MedImmune*, 549 U.S. at 129.

17  Defendants cannot defeat standing by placing Eastside "between the rock of foregoing" their

18  non-unionization contracts and "the hard place of violating the law."  *Bland*, 88 F.3d at 737.

19       Similarly, Defendants' assertion that "[i]ntent to violate the law is not a cognizable

20  Article III injury," Mot. at 16, is wrong.  To argue standing separately from the merits,

21  _____

22       [2] It makes no difference that the anti-retaliation provision does not go into effect until
    June 20, 2016.  *See* Ordinance § 5.  Eastside wishes to adopt non-unionization clauses now and

23  allow them to remain in effect after June 20, Guled Decl. ¶ 11, and will be subject to
    enforcement actions based on the contractual clauses at that time.  This "inevitability of the

24  operation of" the Ordinance means "it is irrelevant to the existence of a justiciable controversy
    that there will be a time delay before the [Ordinance] will come into effect."  *Reg'l Rail*

25  *Reorganization Act Cases*, 419 U.S. 102, 143 (1974); *see also Arizona. v. Atchison, Topeka &*
    *Santa Fe R.R.*, 656 F.2d 398, 402–03 (9th Cir. 1981) (challenge to statute ripe six months before

26  its effective date).

OPPOSITION TO MOTION TO DISMISS - 9
Case No. 2:16-cv-00322 RSL

1   Defendants must assume that the Chamber's legal claim would succeed.  On that assumption,

2   Eastside does not wish to violate the law; it wishes to enter into a lawful contract that is being

3   blocked by threat of unlawful government action.  That is a classic Article III injury.

4       Defendants next contend that the Chamber's members "do not face any specific threat of

5   prosecution."  Mot. at 16, 9–10.  But the cases on which Defendants rely, including *Thomas v.*

6   *Anchorage Equal Rights Commission*, 220 F.3d 1134, 1137 (9th Cir. 1999) (en banc), and *San*

7   *Diego County Gun Rights Committee v. Reno*, 98 F.3d 1121 (9th Cir. 1996), do not apply here.

8       In *Thomas*, landlords challenged an Alaska housing law prohibiting discrimination due to

9   marital status.  220 F.3d at 1137.  They failed to "specify when, to whom, where, or under what

10   circumstances" they would engage in prohibited discrimination.  *Id.* at 1139.  Not surprisingly,

11   there had been no "hint of future enforcement," *id.* at 1140, and "the principal enforcement

12   agencies had never even heard of [the] landlords before they filed [the] action," *id.* at 1137.

13   Indeed, the record did "not indicate even a single criminal prosecution" during "the twenty-five

14   years that [the] housing laws ha[d] been on the books."  *Id.* at 1140.

15       And in *San Diego County Gun Rights Committee*, plaintiffs challenged the federal Crime

16   Control Act of 1994, which imposed new requirements for receiving federal firearms licenses.

17   98 F.3d at 1124.  The plaintiffs alleged "that they 'wish[ed] and intend[ed]' to engage in

18   unspecified conduct prohibited" by the statute.  *Id.*  But they never alleged any specific statutory

19   violation, nor a "particular time or date" on which they wished to take the unspecified actions.

20   *Id.* at 1127.  Nor was there any evidence that the statute would be enforced against them; they

21   could "not identify even a general threat" of prosecution made against them.  *Id.*

22       The difference between those cases and this one is stark:  Chamber member Eastside has

23   specifically stated that it would like to require all drivers to sign non-unionization agreements

24   now.  Guled Decl. ¶ 11.  Defendants' own motion threatens enforcement if Eastside were to do

25   so.  *See supra* p. 9.  Moreover, the anti-retaliation provision is enforceable by a private cause of

26   action, Ordinance §3(M)(3), and it strains credulity to suggest that the Teamsters would not bring

OPPOSITION TO MOTION TO DISMISS - 10
Case No. 2:16-cv-00322 RSL

**STOEL RIVES** LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
*Telephone (206) 624-0900*

1    an action challenging contractual provisions barring drivers from supporting unionization.

2    Finally, the history of the Ordinance renders fanciful any claim that it will not be enforced

3    against the Chamber's members.  This is not a situation in which a twenty-five-year-old law has

4    never been enforced or an even older law has fallen into desuetude.  Nor is this a nationwide law

5    that may be enforced to varying degrees by different U.S. Attorneys.  This is a municipal law

6    enacted for the purpose of bringing immediate change to the for-hire industry.

7         Thus, rather than bearing any similarity to *Thomas* and *San Diego*, this case comfortably

8    falls within the many cases in which the Ninth Circuit has allowed pre-enforcement challenges.

9    *See, e.g.*, *Valle del Sol, Inc. v. Whiting*, 732 F.3d 1006, 1015–16 & 1015 n.5 (9th Cir. 2013)

10   (allowing pre-enforcement challenge to Arizona law absent direct threat of prosecution, because

11   the court has "never held that a specific threat is necessary to demonstrate standing"); *Cal. Pro-*

12   *Life Council, Inc. v. Getman*, 328 F.3d 1088, 1094 (9th Cir. 2003) (allowing pre-enforcement

13   challenge to California statute absent "threat" or "warning" of enforcement, because "*Thomas*

14   did not purport to overrule years of Ninth Circuit and Supreme Court precedent recognizing the

15   validity of pre-enforcement challenges"); *Bland*, 88 F.3d at 737 (allowing pre-enforcement

16   challenge to California statute because "[t]he Attorney General of California ha[d] not stated

17   affirmatively that his office [would] not enforce the civil statute").

18        Finally, Defendants assert that the non-unionization agreements "are in any event legally

19   meaningless," Mot. at 17, because "there is no reason for its members to procure such

20   agreements" if the Ordinance is preempted, and if the Ordinance is lawful "then its members

21   have no right to demand" them, *id.* at 10 n.4.  Yet even if the Ordinance is unlawful, it would not

22   make the non-unionization agreements "legally meaningless."  Mot. at 17.  They would be valid,

23   private contractual agreements, and Defendants provide no legal argument or support to the

24   contrary.  Regardless of whether the Ordinance is eventually invalidated or upheld, Eastside

25   wishes to immediately adopt non-unionization provisions, and the threat of enforcement of the

26   unlawful Ordinance has "effectively coerced" it from doing so.  *MedImmune*, 549 U.S. at 129.

OPPOSITION TO MOTION TO DISMISS - 11
Case No. 2:16-cv-00322 RSL

1    And there is nothing wrong with proactively preventing unionization among drivers, rather than

2    litigating preemption or other legal flaws in the Ordinance on a case-by-case basis.  That is

3    sufficient for standing.

4         **ii.**      *Current expenditures.*  A plaintiff also has standing when it "reasonably incur[s]

5    costs to mitigate or avoid" a "substantial risk" of injury.  *Clapper v. Amnesty Int'l USA*, 133 S.

6    Ct. 1138, 1150 n.5 (2013); *accord Mendia v. Garcia*, 768 F.3d 1009, 1013 n.1 (9th Cir. 2014).

7    Here, the Chamber's members are already spending substantial time, money, and resources to

8    reasonably prepare for the Ordinance's "operation" and "enforcement."  *Babbitt*, 442 U.S. at 298.

9         *First*, the Ordinance grants unions the right to seek majority support for collective

10   bargaining among drivers with a company.  Ordinance § 3(B)–(F).  At the same time, the

11   Chamber's members have a "First Amendment right" to "engage in noncoercive speech about

12   unionization" and "attempt[] to persuade" those drivers "not to join a union."  *Chamber of

13   Commerce v. Brown*, 554 U.S. 60, 66–67 (2008).  Eastside has begun to exercise this right in

14   anticipation of forthcoming organizing efforts, by contacting drivers to educate them about the

15   drawbacks of exclusive union representation, Guled Decl. ¶ 12, and Uber intends to educate

16   drivers about the impact of unionization, Matthews Decl. ¶ 19.  *Second*, as companies that have

17   not previously had to deal with union campaigns and organized labor—because their drivers are

18   independent contractors, not employees—the Chamber's members will need to hire attorneys

19   and consultants to assist them with their obligations under the Ordinance.  Matthews Decl. ¶ 17;

20   Guled Decl. ¶ 12.  Uber, in particular, has already expended, and continues to expend, substantial

21   time and resources engaging costly experts to advise Uber about navigating the collective-

22   bargaining process, and recruiting and hiring personnel to serve as permanent staff members.

23   Matthews Decl. ¶ 19.  *Third*, Uber and Eastside are also currently devoting substantial resources

24   to participating in the City's rulemaking efforts.  *See* Matthews Decl. ¶ 18; Guled Decl. ¶ 10.

25        These business expenditures, taken to avoid or mitigate the Ordinance's harmful

26   consequences, are sufficient injuries to support Article III standing.  The expenditures are

OPPOSITION TO MOTION TO DISMISS - 12
Case No. 2:16-cv-00322 RSL

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
Telephone (206) 624-0900

1  reasonable because they are a fitting "reaction to a risk of harm"—namely, a union organizing

2  campaign—that is imminent and certainly impending.  *Clapper*, 133 S. Ct. at 1151; *see also*

3  *infra* pp. 16–17 (discussing imminence of organizing campaign).  Moreover, it is reasonable—

4  indeed, necessary—for the Chamber's members to undertake these activities *now*, before a QDR

5  is designated, because drivers can sign a statement of interest at any time after a QDR is

6  designated (there is no voting date) and the City has provided no mechanism to revoke those

7  authorizations.  *See* Ordinance § 3(F).  A Chamber member that delays contacting drivers until a

8  QDR is designated thus risks losing the opportunity to persuade those drivers to vote against

9  unionization.  Indeed, Teamsters representatives have already been contacting drivers, Korrell

10  Decl., Exs. B, J, making it even more urgent for the Chamber's members to do the same.

11       Defendants insist that these injuries do not support standing because they are self-

12  inflicted and voluntary.  Mot. at 9–10, 15–16.  But they are inflicted by dint of the Ordinance and

13  would not be necessary but for its enactment.  Regardless, "voluntary" measures can certainly

14  support Article III standing.  For example, in *Monsanto Co. v. Geertson Seed Farms*, 561 U.S.

15  139 (2010), conventional alfalfa farmers challenged an agency's decision to deregulate

16  genetically engineered alfalfa, *id.* at 153.  They argued that deregulation would cause a

17  "substantial risk" of genetic contamination, so they would "need to test [their] crops for the

18  presence of genetically engineered alfalfa seed," and had already "begun contracting with

19  growers outside of the United States" to ensure a genetically pure seed supply.  *Id.* at 154–55.

20  These "self inflicted" injuries were "sufficiently concrete" for standing, "even if [the] crops

21  [were] not actually" contaminated.  *Id.* at 155; *see also, e.g.*, *Friends of Earth, Inc. v. Laidlaw*

22  *Envt'l Servs. (TOC), Inc.*, 528 U.S. 167, 181–82 (2000) (voluntarily refraining from swimming,

23  camping, and bird-watching for fear of exposure to mercury was sufficient injury); *Meese v.*

24  *Keene*, 481 U.S. 465, 473 (1987) (voluntarily refraining from exhibiting a film because

25  government declared it political propaganda was sufficient injury).

26       Cases rejecting voluntary actions as sufficient for standing have done so because the

OPPOSITION TO MOTION TO DISMISS - 13
Case No. 2:16-cv-00322 RSL

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
Telephone (206) 624-0900

1    plaintiffs responded to potential injuries that were speculative, and their protective measures

2    against speculative harms were therefore not directly traceable to the defendants.  In *Clapper*, for

3    example, the plaintiffs' measures taken to avoid phone surveillance were based on a "highly

4    speculative fear" that the government would monitor the plaintiffs' calls using the procedures

5    authorized under the challenged wiretapping program.  133 S. Ct. at 1148.  Thus, the problem in

6    *Clapper* was that "the harm respondents [sought] to avoid [was] not certainly impending," *id.* at

7    1151, especially considering that the surveillance program did not regulate the plaintiffs, *id.* at

8    1153.  The Court made clear that standing requirements are satisfied when plaintiffs "reasonably

9    incur costs to mitigate or avoid" a "substantial risk" of injury.  *Id.* at 1150 n.5.[3]  The same is true

10   in other similar cases.  *See, e.g.*, *Mendia*, 768 F.3d at 1013 n.1 (decision to remain in custody

11   was self-inflicted because there was no "substantial risk" of future harm if plaintiff left state

12   custody); *Nat'l Family Planning & Reproductive Health Ass'n, Inc. v. Gonzales*, 468 F.3d 826,

13   831 (D.C. Cir. 2006) (injury was self-inflicted because plaintiff had "within its grasp an easy

14   means for alleviating the alleged" injury by asking an administrative agency for a clarifying rule).

15   Unlike those cases, the actions the Chamber's members have taken are "a reasonable reaction to

16   a risk of harm," *Clapper*, 133 S. Ct. at 1151, because the Ordinance regulates, constrains, and

17   compels the Chamber's members to participate in unionization efforts and collectively bargain

18   with for-hire drivers, events that are certainly impending.

19                          **(b)      Substantial Risk of Future Injury**

20           **i.**      *Mandatory disclosure provision*.  The Chamber's members are also subject to

21   imminent injury because they will soon be required to disclose "the names, addresses, email

22   addresses (if available), and phone number (if available) of all qualifying drivers they hire,

23   contract with, or partner with."  Ordinance § 3(D).  Uber and Eastside are subject to the

24   disclosure requirement because each contracts with "50 or more for-hire drivers," *id.*, and will

25   _____

26           [3] *Clapper* analyzed this issue as one of traceability.  133 S. Ct. at 1150–52.  But the
     outcome is the same whether the issue is framed as traceability or injury.

OPPOSITION TO MOTION TO DISMISS - 14
Case No. 2:16-cv-00322 RSL

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
Telephone (206) 624-0900

1   continue to do so, Matthews Decl. ¶ 16; Guled Decl. ¶ 4.  This coerced disclosure is an Article

2   III injury in its own right.  *See, e.g.*, *Davis v. FEC*, 554 U.S. 724, 733 (2008) (standing to

3   challenge mandatory campaign disclosures); *NAACP v. Patterson*, 357 U.S. 449, 458–59 (1958)

4   (standing to challenge compelled disclosure of association's membership lists).  Even more

5   concretely here, complying with the disclosure requirement will require these members to

6   expend substantial time and resources to ensure that the correct information is disclosed, and that

7   no privileged or protected information is produced.  Matthews Decl. ¶ 20; Guled Decl. ¶ 13.

8       Moreover, these driver lists contain confidential information that the Chamber's members

9   maintain as a trade secret.  *Id.*  Uber's driver lists, for example, are highly valuable and would be

10  of great interest to its competitors.  Matthews Decl. ¶ 20.  Because drivers pay a service fee to

11  use the Uber App, drivers are customers of Uber, so production of this information would reveal

12  a closely guarded customer list.  *Id.*  Uber has only released similar lists to service providers

13  under agreements with extensive privacy and security obligations.  *Id.*  Further, the drivers

14  whose names would appear on this list under the Ordinance are entitled to privacy and expect

15  that Uber will safeguard their names and contact information.  *Id.*  If the Ordinance is enforced,

16  the Chamber's members will lose the value of this intellectual property—an injury sufficient for

17  Article III standing.  *Already, LLC v. Nike, Inc.*, 133 S. Ct. 721, 727 (2013).

18      Defendants do not dispute that the required disclosure of driver information constitutes an

19  injury for standing purposes, but contend that this injury is speculative because the disclosure

20  requirement will be triggered only if a union seeks to become a QDR, the Director approves, and

21  the union then requests driver lists from a member subject to the Ordinance.  Mot. at 8, 14.  But

22  so long as the risk of injury is genuine and realistic, rather than speculative and imaginary, the

23  "substantial risk" standard does not require a plaintiff to prove with absolute certainty that future

24  injury will occur or that no contingencies exist that might affect the injury.  *Susan B. Anthony*

25  *List*, 134 S. Ct. at 2342 ("sufficiently imminent"); *Babbitt*, 442 U.S. at 298 ("realistic danger");

26  *MedImmune*, 549 U.S. at 129 ("genuine threat"); *see also supra* note 2.

OPPOSITION TO MOTION TO DISMISS - 15
Case No. 2:16-cv-00322 RSL

1    The Ordinance's operation is neither speculative nor imaginary; it is substantially certain

2    to occur.  *First*, the Teamsters Local Union No. 117 (or an affiliated entity) is substantially

3    certain to seek designation as a Qualified Driver Representative.  Local 117 was a driving force

4    behind enactment of Ordinance.  *See supra* p. 3.  Representatives from Local 117 frequently

5    contacted the City Council and Mayor's office during the drafting and enactment of the

6    Ordinance, urging the City to take "swift action" to authorize collective bargaining for "Uber and

7    Lyft" drivers.  *See supra* p. 3.  And Local 117 has already been assisting drivers on the Uber

8    platform in organizing meetings with public officials "about the policies that [a]ffect their ability

9    to make a living and succeed in today's rapidly changing transportation environment."  Korrell

10   Decl., Ex. L; *see also* Exs. A, B, I, J.  Further, there is no doubt that Local 117 meets the minimal

11   statutory requirements for certification as a QDR:  it is registered with the Washington Secretary

12   of State as a not-for-profit entity; its bylaws give drivers the right to be members and participate

13   in elections; and it has experience in and a commitment to collective bargaining, *see* Teamsters

14   117 Registration Page, Wash. Sec'y of State, goo.gl/RTw12j; Union Search, U.S. Dep't of Labor,

15   goo.gl/wMufaV.  *See also Davis*, 554 U.S. at 733–34 (candidate has standing to challenge statute

16   giving opponent right to additional contributions where, "[w]hen [plaintiff] filed suit," "there

17   was no indication that his opponent would forgo that opportunity").

18       *Second*, Defendants have refused to say they will not implement the Ordinance or

19   designate a QDR.  Compl. ¶ 43.  To the contrary, Defendants have stated they expect the

20   disclosure provision to be triggered no later than December 2, 2016.  Carey Decl. ¶ 3.

21   Defendants cannot now plausibly contend that no QDR will be designated, and that they expect

22   this recently enacted Ordinance never to take effect.  After all, the successful business operations

23   of Uber and Lyft are the primary reason why the City enacted the Ordinance.  The entire goal,

24   according to Councilmember O'Brien, was to "balance the playing field" between Uber and

25   "drivers making less than minimum wage."  Beekman, *An Uber Union?*, *supra* p. 3.  This newly

26   enacted Ordinance is the product of intense efforts by the City and the Teamsters over the last

OPPOSITION TO MOTION TO DISMISS - 16
Case No. 2:16-cv-00322 RSL

1    year, aimed directly at the Chamber's members.  Indeed, after filing their motion to dismiss,

2    Defendants requested that the Chamber's members turn over certain driver and trip data so that

3    the City could begin drafting rules that would implement the Ordinance.   Matthews Decl. ¶ 18;

4    Guled Decl. ¶ 10.  These efforts belie Defendants' disingenuous claim that the Ordinance would

5    have no effect against its primary targets.

6          The supposed contingencies in this case are no greater than in other cases in which the

7    Ninth Circuit has found standing.  In *City of Oakland v. Lynch*, the court held that a city had

8    standing to challenge a federal forfeiture *action* because revenues would be lost if forfeiture were

9    *ordered*; the "uncertain[ty]" of the forfeiture order was "not so speculative" as to undermine

10   standing.  798 F.3d 1159, 1164 (9th Cir. 2015).  And in *Alaska Airlines, Inc. v. City of Long*

11   *Beach*, the court held that airlines had standing to challenge an ordinance authorizing an airport

12   manager to require airlines to reduce flights if they exceeded certain noise levels even though the

13   airport manager had not yet cut off any flights because "the threat of action [was] very real."

14   951 F.2d 977, 987 (9th Cir. 1991) (per curiam).  Likewise, the operation and enforcement of the

15   Ordinance creates a sufficiently imminent threat that the Chamber's members—the Ordinance's

16   targets—will be injured through compelled disclosure of their confidential driver lists.[4]

17          **ii.**     *Mandatory collective bargaining.*  Finally, the Chamber's members are subject to

18   imminent injury through compelled participation in the City's collective-bargaining scheme and

19   forced adherence to a collective-bargaining agreement.  For the same reasons discussed above

20   concerning compelled disclosure of driver lists, this injury is imminent and not speculative—

21   after all, the primary goal of the Ordinance is to require companies like Uber and Lyft to

22   ──────────────

23          [4] Defendants also contend that, because a party must demonstrate standing for each of its
     claims, this injury "allow[s] the Chamber to challenge *only* the disclosure provision of the
     Ordinance."  Mot. at 24.  But the disclosure provision and the collective-bargaining provisions

24   are inextricably interrelated:  the only permitted use of the driver lists is union organizing, *see*
     Ordinance § 3(E), and an EDR cannot be qualified for collective bargaining absent a driver list,

25   *see id.* § 3(F).  The disclosure provision is thus invalid for all the same reasons the collective-
     bargaining provisions are invalid, and the imminent threat of forced disclosure therefore gives

26   the Chamber standing to pursue each of its claims.

OPPOSITION TO MOTION TO DISMISS - 17
Case No. 2:16-cv-00322 RSL

collectively bargain with for-hire drivers.

### 2. These Injuries Are Traceable To The Defendants And Redressable Through A Favorable Ruling From This Court

Defendants' arguments concerning traceability and redressablity fare no better.  A plaintiff must show "a causal connection between the injury and the [challenged] conduct," and that it is "likely" "the injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 560–61.  Here, Defendants' enforcement of the Ordinance will cause the alleged injuries.  If the Ordinance were not enforced, the Chamber's members would not suffer their asserted injuries.  Further, declaratory and injunctive relief can prevent Defendants from enforcing the Ordinance.

Defendants argue that these injuries are not traceable to them or redressable by this Court because "the Chamber itself alleges that the question whether these drivers are employees under the NLRA is an open one."  Mot. at 17.  That is incorrect, and based on a mischaracterization of the Chamber's preemption arguments.  The companies that are the targets of the Ordinance have consistently maintained that drivers are independent contractors, and the Chamber agrees.  Compl. ¶¶ 19–20, 44, 105; Guled Decl. ¶ 7; Matthews Decl. ¶ 15; *see also Narayanan v. British Airways*, 747 F.3d 1125, 1126 n.1 (9th Cir. 2014) (on motion to dismiss, "all factual allegations set forth in the complaint are taken as true and construed in the light most favorable to Plaintiffs").

It is true, however, that at least some *litigants* contend that drivers with companies such as Uber are arguably employees.  *See* Matthews Decl. ¶ 15.  But even if some might believe they are arguably employees, that says nothing about whether the injuries alleged in this case are traceable to Defendants.  Defendants are the ones causing injury now, by attempting to enforce the Ordinance's requirements as to individuals who are presently classified, and treated by the Chamber's members, as independent contractors.  Stated differently, the Chamber's members would not be incurring the expenses or be at risk of the injuries described above absent the Ordinance, and those expenses and risks will be eliminated if the Court enjoins the Ordinance.

OPPOSITION TO MOTION TO DISMISS - 18
Case No. 2:16-cv-00322 RSL

**STOEL RIVES LLP**
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
Telephone (206) 624-0900

1  **B.      The Chamber's Purpose Is To Advance The Interests At Issue In This Suit**

2          The interests at issue in this lawsuit are at the heart of the Chamber's purpose "to

3  represent the interests of its members and the overall business community in order to promote

4  and strengthen American free enterprise."  Eversole Decl. ¶ 3.  This suit advances these precise

5  interests, seeking to strengthen free enterprise by increasing competition among independent

6  contractors, ensuring uniform labor policy, and protecting the privacy and value of growing

7  businesses.  The relief requested is necessary to nurture the advancement of new technology,

8  protect businesses' stability and viability, and support a growing sector of the economy.

9  **C.      This Suit Does Not Require The Participation Of The Chamber's Members**

10         Of course, the Chamber's identification of members to establish particularized

11 *injury* does not establish that the participation of those members is necessary to adjudicate the

12 Chamber's specific *claims*.  As the Supreme Court has made clear, "'individual participation' is

13 not normally necessary when an association seeks prospective or injunctive relief for its

14 members." *United Food & Commercial Workers v. Brown Group*, *Inc*., 517 U.S. 544, 546

15 (1996) (quoting *Hunt*, 432 U.S. at 343).  And nothing takes this suit for prospective injunctive

16 and declaratory relief outside that general rule.

17         "Neither [the Chamber's] claims nor the relief sought require[s] the District Court to

18 consider the individual circumstances of any aggrieved . . . member." *Auto. Workers v. Brock*,

19 477 U.S. 274, 287 (1986).  Each of the Chamber's claims raises a "pure question of law," and the

20 Chamber can prove entitlement to the relief sought without substantial "individualized proof."

21 *Id.*  Moreover, the remedies that the Chamber seeks, "if granted, will inure to the benefit of those

22 members of the association actually injured."  *Id.* at 288.  Because participation of the Chamber's

23 individual members is unnecessary, the Chamber has standing to bring this suit.

24         Defendants acknowledge as much with respect to several of the Chamber's claims.  They

25 concede, as they must, that the Chamber satisfies this prong of associational standing with

26 respect to its claims for *Machinists* preemption and *ultra vires* action under state law.  Mot. at

OPPOSITION TO MOTION TO DISMISS - 19
Case No. 2:16-cv-00322 RSL

**STOEL RIVES** LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
Telephone (206) 624-0900

1   20–24.  At an absolute minimum, then, those claims could proceed now.  But the Defendants'

2   arguments that the Chamber's remaining claims are not fit for resolution without individual

3   participation are meritless, and those claims, too, should be resolved now.

4          1.      **Individual participation is unnecessary for the antitrust claims**

5          Defendants err in asserting that participation of the Chamber's individual members is

6   required for the Chamber's federal and state antitrust claims.  Defendants contend that only a

7   party "threatened [with] loss or damage" may bring a federal antitrust claim for injunctive relief,

8   *see* Clayton Antitrust Act § 16, 15 U.S.C. § 26, and that only a "person who is injured in his or

9   her business or property" may bring a state antitrust claim, *see* Wash. Rev. Code § 19.86.090.

10  These claims, Defendants argue, require individualized proof, and thus individual member

11  participation.  Defendants also assert, in the alternative, that the statutory requirement that

12  federal antitrust plaintiffs show "antitrust injury" means that antitrust claims must be brought by

13  the party who has actually suffered antitrust injury, rather than an associational representative.

14         For one thing, Defendants' argument—based on specific language in the Sherman Act

15  and the state antitrust statute—is wholly inapplicable to the Chamber's federal and state

16  preemption claims.  Those preemption claims are not statutory causes of action; rather, they

17  invoke this Court's equitable authority under *Ex Parte Young*, 209 U.S. 123, 155–56 (1908), to

18  enjoin the enforcement of local enactments preempted by federal law, and its similar authority

19  under state law to enjoin a municipal ordinance or declare it preempted, *see, e.g.*, *Cannabis*

20  *Action Coal. v. City of Kent*, 351 P.3d 151, 154 (Wash. 2015).

21         Moreover, even with respect to the Chamber's separate claim for injunctive relief under

22  the Clayton Act, Defendants' position is not the law.  Courts routinely hold that associations

23  have standing under the Clayton Act so long as they satisfy *Hunt*'s associational standing

24  requirements.  *See, e.g.*, *S.W. Suburban Bd. of Realtors, Inc. v. Beverly Area Planning Ass'n*,

25  830 F.2d 1374, 1380 (7th Cir. 1987) (citing cases); *Nat'l Constructors Ass'n v. Nat'l Elec.*

26  *Contractors Ass'n, Inc.*, 498 F. Supp. 510, 515 (D. Md. 1980), *aff'd as modified*, 678 F.2d 492

OPPOSITION TO MOTION TO DISMISS - 20
Case No. 2:16-cv-00322 RSL

1    (4th Cir. 1982).  These holdings make perfect sense because there is nothing unique about the

2    antitrust context.  An associational plaintiff must *always* show, to establish standing, that one (or

3    more) of its members has suffered (or will imminently suffer) injury, *see Warth*, 422 U.S. at 511,

4    and the language like that on which Defendants rely is routine in statutes creating a cause of

5    action, *see, e.g.*, 42 U.S.C. § 1983; 5 U.S.C. § 702; 33 U.S.C. § 1365(a), (g).  The "antitrust

6    injury" requirement simply means that the members' injury must be of a particular type;

7    individual participation is unnecessary to resolve that purely legal issue.[5]

8         **2.    Individual participation is unnecessary for the *Garmon* claim**

9         Defendants are incorrect that the *Garmon* preemption claim requires proof that individual

10   members contract with drivers who are arguably NLRA "employees."  The Chamber is not

11   claiming that the Ordinance cannot be enforced against any *particular* member that is arguably

12   employing drivers.  Rather, the claim is that the Ordinance is *categorically* unenforceable—as to

13   *anyone*—because it tasks local officials and state courts, rather than the federal agency charged

14   with interpreting the NLRA, with defining the contours of one of the essential terms of the Act:

15   "employee."  *See* Ordinance § 6 ("The provisions of this Ordinance do not apply to drivers who

16   are employees under 29 U.S.C. § 152(3).").  And that necessarily injects city officials and state

17   courts into the business of declaring what the NLRA means.  *See Marine Eng'rs v. Interlake S.S.*

18   *Co.*, 370 U.S. 173, 180 (1962).  This claim presents a "pure question of law" that requires no

19   consideration of any of the Chamber's members particular factual circumstances, and thus it is

20   plainly appropriate for resolution in this lawsuit.  *See Brock*, 477 U.S. at 287.

21        **3.    Individual participation is unnecessary for the PRA claim**

22        Defendants' challenge to the Chamber's standing to bring its Public Records Act claim is

23   equally baseless.  Although the Chamber has properly shown that at least one of its members

24

25        ─────────────
          [5] Unlike here, Defendants' sole case, *Aspen Grove Owners Ass'n v. Park Promenade*
     *Apartments, LLC*, No. 09 Civ. 1110, 2010 WL 4860345 (W.D. Wash. Nov. 19, 2010), involved
26   *compensatory damages*, for which individualized proof is typically required.  *Id.* at *1, *4.

OPPOSITION TO MOTION TO DISMISS - 21
Case No. 2:16-cv-00322 RSL

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
Telephone (206) 624-0900

1    maintains driver lists as trade secrets and thus is injured by the Ordinance's disclosure

2    requirement, Matthews Decl. ¶ 20, the Chamber is not claiming that the disclosure requirement is

3    preempted as to particular members because their driver lists are trade secrets.  Rather, the

4    Chamber's claim is that the disclosure requirement is preempted *insofar as it requires an*

5    *individual to produce a trade secret*.  And the relief that the Chamber seeks is tailored to the

6    limited nature of its claim.  The Chamber asks that the Court declare (and enter a corresponding

7    injunction) that Defendants cannot apply the Ordinance to compel the release of a trade secret.

8    This claim too therefore presents a pure question of law:  whether the Public Records Act

9    preempts the Ordinance insofar as the Ordinance compels disclosure of trade secrets protected by

10   the Washington Trade Secrets Act, Wash. Rev. Code § 19.108.010(4).  That legal question can

11   and should be answered without individual participation.

12   **II.    THE SO-CALLED PRUDENTIAL RIPENESS DOCTRINE PROVIDES NO
         BASIS FOR REFUSING TO EXERCISE JURISDICTION**

13
              Because the Chamber's members satisfy Article III standing requirements, the defunct
14
     "prudential ripeness" doctrine does not allow the Court to refuse to exercise jurisdiction.  *Susan*
15
     *B. Anthony List*, 134 S. Ct. at 2347.  As the Supreme Court has repeatedly explained, to hold
16
     claims nonjusticiable "on grounds that are prudential, rather than constitutional," "is in some
17
     tension with . . . the principle that a federal court's obligation to hear and decide cases within its
18
     jurisdiction is virtually unflagging."  *Id.* (quotation marks omitted); *accord Lexmark Int'l, Inc. v.*
19
     *Static Control Components, Inc.*, 134 S. Ct. 1377, 1386 (2014); *Sprint Comms., Inc. v. Jacobs*,
20
     134 S. Ct. 584, 591 (2013).  This Court should therefore reject Defendants' errant invitation to
21
     "decline to exercise its jurisdiction based on prudential concerns."  Mot. at 10.
22
              But even if the prudential ripeness doctrine were viable in theory, there is no basis for
23
     applying it here.  The two factors courts have previously considered are the "fitness" of the
24
     issues for judicial review and the "hardship" to the parties if relief is denied.  *Susan B. Anthony*
25
     *List*, 134 S. Ct. at 2347.  Both those factors weigh heavily in the Chamber's favor.
26

OPPOSITION TO MOTION TO DISMISS - 22
Case No. 2:16-cv-00322 RSL

STOEL RIVES LLP
ATTORNEYS
600 University Street, Suite 3600, Seattle, WA  98101
*Telephone* (206) 624-0900

### A.     The Chamber's Claims Are Fit For Judicial Review

Each of the Chamber's claims present purely legal issues fit for review now.  *First*, the antitrust claims allege that the Ordinance authorizes horizontal price fixing—a *per se* antitrust violation.  These claims require legal analysis of the relationship between the Ordinance and the Sherman Act.  Because the Chamber is raising only a *per se* challenge, factual development of anticompetitive effects in a relevant market is unnecessary.  *Big Bear Lodging Ass'n v. Snow Summit, Inc.*, 182 F.3d 1096, 1105–06 (9th Cir. 1999).  *Second*, the NLRA preemption claims are legal disputes over the relationship between the Ordinance and federal labor law.  The *Machinists* preemption claim requires interpretation of the NLRA's exemption of independent contractors from collective-bargaining requirements.  The *Garmon* preemption claim asks whether the National Labor Relations Board, rather than local officials and state courts, has primary jurisdiction to determine whether drivers using the Uber or Lyft App are independent contractors.  That issue requires no factual development because the Court need only decide whether the NLRB has exclusive jurisdiction.  *Third*, the state-law *ultra vires* claim simply asks the Court to interpret the statutes that the City relies on for authority to enact the Ordinance.  *Fourth*, the state trade-secret claim primarily involves questions of statutory interpretation, particularly whether the driver lists of the Chamber's members qualify as public records.  The Chamber has already submitted ample proof that the driver lists qualify as trade secrets.  Matthews Decl. ¶ 20; Guled Decl. ¶ 13.  *Finally*, as to all of these claims, the Chamber seeks only prospective injunctive relief, obviating the need for any individualized proof of damages.

Defendants vaguely refer to "all the facts that must be developed" before evaluating the merits, Mot. at 10, but they fail to note a single issue for which factual development is necessary.  That is because there are none; all issues presented are legal ones fit for judicial resolution now.

### B.     Chamber Members Will Suffer Substantial Hardship If Review Is Deferred

Denying prompt judicial review will also "impose a substantial hardship" on the Chamber's members.  *Susan B. Anthony List*, 134 S. Ct. at 2347.  The Ordinance's anti-

1    retaliation provision is already causing hardship by preventing one Chamber member from

2    adopting non-unionization provisions in its driver contracts.  *See supra* p. 7.  And the Chamber's

3    members are currently expending time, money, and resources to prepare for the union organizing

4    authorized by the Ordinance, such as through hiring labor experts and educating drivers about

5    the impact of unionization.  *See supra* p. 12.

6           Even focusing solely on the mandatory disclosure requirements, it makes no sense to

7    delay this suit.  Defendants suggest that, to avoid turning over driver information, the Chamber

8    should wait to sue at least until the Director designates a QDR and that entity "announces its

9    intent" to seek to become an EDR by demanding a driver list.  Mot. at 8; *see also* Mot. at 14.

10   But because of the Ordinance's compressed timetable, delaying that long would force the

11   Chamber or its members to seek injunctive relief on a highly expedited basis.  Specifically, a

12   driver coordinator will be required to disclose driver information as early as sixteen days after

13   the QDR demands that information.  *See* Ordinance § 3(C) & (D); Carey Decl. ¶ 5 & Ex. A.

14   Thus, under Defendants' approach, the parties would need to brief and argue, and the Court

15   would need to decide, the several complicated legal issues presented by this case in just over two

16   weeks.  That shortened timetable is entirely unnecessary and wasteful of the parties' and the

17   Court's resources.  It would be better to allow for deliberate, comprehensive consideration of the

18   merits on a reasonable time schedule over the coming months than to follow Defendants' plan

19   and wait until the case becomes an emergency.

20                                   **CONCLUSION**

21           For the foregoing reasons, Defendants' motion to dismiss should be denied.

22   Respectfully submitted,

23   Lily Fu Claffee                          By:   *s/ Timothy J. O'Connell*
     (D.C. Bar No. 450502)                    Timothy J. O'Connell, WSBA 15372
24   (pro hac vice)                           STOEL RIVES LLP
                                              600 University Street, Suite 3600
25   Steven P. Lehotsky                       Seattle, WA 98101
     (D.C. Bar No. 992725)                    (206) 624-0900
26   (pro hac vice)                           (206) 386-7500 FAX
                                              Tim.oconnell@stoel.com

OPPOSITION TO MOTION TO DISMISS - 24
Case No. 2:16-cv-00322 RSL

1   Warren Postman                                    Noel J. Francisco
    (D.C. Bar. No. 995083)                            (D.C. Bar No. 464752)
2   (pro hac vice)                                    (pro hac vice)

3   U.S. CHAMBER LITIGATION CENTER                    Jacqueline M. Holmes
    1615 H Street, N.W.                               (D.C. Bar No. 450357)
4   Washington, D.C. 20062                            (pro hac vice)
    (202) 463-3187
5   slehotsky@uschamber.com                           Christian G. Vergonis
                                                      (D.C. Bar No. 483293)
6                                                     (pro hac vice)

7                                                     Robert Stander
                                                      (D.C. Bar No. 1028454)
8                                                     (pro hac vice)

9                                                     JONES DAY
                                                      51 Louisiana Avenue, N.W.
10                                                    Washington, D.C.  20001
                                                      (202) 879-3939
11                                                    (202) 616-1700 FAX
                                                      nfrancisco@jonesday.com

12                                                    ATTORNEYS FOR PLAINTIFF

13

14

15

16

17

18

19

20

21

22

23

24

25

26

OPPOSITION TO MOTION TO DISMISS - 25
Case No. 2:16-cv-00322 RSL

1

## CERTIFICATE OF SERVICE

2

I hereby certify that on May 9, 2016, I electronically filed the foregoing with the Clerk of

3

the Court using the CM/ECF system which will send notification of such filing to the parties who
have appeared in this case

4

DATED:  May 9, 2016 at Seattle, Washington.

5

6                                                STOEL RIVES LLP

7                                                *s/ Timothy J. O'Connell*
                                                 _____
8                                                Timothy J. O'Connell, WSBA No. 15372
                                                 600 University Street, Suite 3600
9                                                Seattle, WA  98101
                                                 Telephone: (206) 624-0900
10                                               Facsimile: (206) 386-7500
                                                 Email: tim.oconnell@stoel.com
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

OPPOSITION TO MOTION TO DISMISS - 26
Case No. 2:16-cv-00322 RSL